**Marc TENENBAUM and Mary Tenenbaum, individually and on behalf of Sarah Tenenbaum, an infant, Plaintiffs,**

v.

**Nat WILLIAMS, individually and as caseworker, Child Welfare Administration, Veronica James, individually and as caseworker, Child Welfare Administration, Doby Flowers, individually, Marva Livingston Hammons, as Commissioner of Social Services of the City of New York, Brooke Trent, individually, Claude Meyers, as Deputy Commissioner of Social Services of the City of New York, City of New York, and New York City Board of Education, Defendants.**

No. 91–CV–0037 (DRH).

United States District Court,
E.D. New York.

Nov. 20, 1995.

Lansner & Kubitschek by Carolyn A. Kubitschek and David J. Lansner, New York City, for Plaintiffs.

Paul A. Crotty, New York City Corporation Counsel by Bruce Rosenbaum, New York City, for Defendants.

## MEMORANDUM AND ORDER

HURLEY, District Judge.

Defendants have moved, pursuant to Federal Rules of Civil Procedure 54(b) and (6)(b) and Civil Rule 3(j) of the Rules of the United States District Courts for the Southern and Eastern Districts of New York, for reargument and reconsideration of the portion of this Court's Memorandum and Order dated September 30, 1994, which held that a caseworker who has lawfully effected an emergency removal of a child from her home without a court order must, nonetheless, provide notice to the parents and obtain judicial authorization before directing an invasive investigatory medical examination of the child.

Defendants' motion for reargument is denied as untimely. However, had reconsideration been granted, the Court would have adhered to its original decision. Given the importance of the interests involved in the present litigation, a two part, disjunctive, analysis has been undertaken rather than simply concluding the inquiry based upon the belated nature of defendants' request.

## BACKGROUND

The facts, and original concomitant arguments of counsel, are fully set forth in this Court's decision of September 30, 1994. Familiarity with the contents of that decision will be presumed for present purposes. By way of a brief synopsis, however, the essential facts include the following:

1. On January 9, 1990, the Child Welfare Administration removed five year old Sarah Tenenbaum from her kindergarten class at P.S. 230 in Brooklyn, pursuant to the emergency removal provisions of Family Court Act Section 1024 and Social Service Law Section 417.[1] The basis for the emergency removal was probable cause to believe that the child had been sexually abused by her father.

2. Sarah was taken directly from her kindergarten class to Coney Island Hospital where she was subjected to a gynecological examination. It is undisputed that the sole purpose of that examination was to determine whether sexual abuse had occurred. No claim has been advanced, directly or indirectly, that the examination was related to necessary medical care or treatment of the child following assumption of custody by the Child Welfare Administration.

---

1. New York Family Court Act Section 1024(a)(ii) authorizes removals in emergency situations where "there is not enough time to apply for a [court] order...." Social Service Law Section 417 permits "pursuant to the requirements and provisions of the family court act," a caseworker to take a child into protective custody, without the consent of a parent, if there is reasonable cause to believe that the failure to do so will present "an imminent danger to the child's life or health."

3. The results of the gynecological examination were negative and the child was reunited with her parents later that day.

4. No efforts were made by the Child Welfare Administration to obtain judicial authorization for the invasive examination of Sarah, nor to obtain parental consent, or to otherwise notify the parents of what was transpiring until after the fact.

Sarah's parents filed a complaint, pursuant to 42 U.S.C. Section 1983, alleging a myriad of constitutional violations committed by defendants against them and their daughter. The defendants answered that their conduct was in full conformity with applicable law and even if, *arguendo*, that was not the case, the individual defendants were insulated from liability pursuant to the doctrine of qualified immunity.

The Court, in its decision of September 30, 1994, granted defendants' application for summary judgment in large measure, but denied it in part. Plaintiffs' cross-motion for summary judgment was denied *in toto*. The partial denial of the defendants' motion was premised on the Court's conclusion that plaintiffs had established, based on the uncontroverted facts, that the invasive physical examination of Sarah, following her emergency Section 1024 removal, was violative of the due process clause of the Fourteenth Amendment, and constituted a violation of her Fourth Amendment rights as well.

The individual defendants were found to be entitled, as a matter of law, to qualified immunity under the facts as presented and, accordingly, the claims against them were dismissed. That defense, of course, is not available to the City of New York. Therefore, if the constitutional deprivations are traceable to a policy, procedure or other actionable wrong of the City, that defendant may be called upon to answer in damages. For that reason, defendants' motion for summary judgment dismissing the claims against defendant City of New York was denied.[2]

*POSITIONS OF PARTIES RE: MOTION FOR RECONSIDERATION*

In seeking reargument and reconsideration, defendants rely primarily on the following three arguments:

1. the Court failed to consider Social Services Law Section 383–b (entitled "Medical Treatment for Abused or Neglected Children; Consent of Commissioners") which, defendants maintain, rendered prior judicial approval or parental consent unnecessary for the gynecological examination of Sarah;

2. the Court's reliance on *van Emrik v. Chemung County Dep't of Social Serv.*, 911 F.2d 863 (2d Cir.1990) was misplaced, *inter alia*, because the removal of the child in *van Emrik* occurred after, not before, the investigatory medical procedure was conducted. In contrast, the emergency removal in the present case occurred before the examination. That distinction, or so defendants' argument continues, renders the analysis in *van Emrik* irrelevant for present purposes; and

3. the Court's decision is factually flawed for it fails to consider the bureaucratic complexities of Family Court practice in the five boroughs of New York City.

In opposition to the relief requested by defendants, plaintiffs argue that:

1. defendants' motion is untimely under Civil Rule 3(j) of the Rules of the United States District Courts for the Southern and Eastern Districts of New York and, accordingly, must be denied;

2. defendants' motion is also subject to summary denial for improperly advancing new facts, issues and arguments not previously presented to the Court;

3. if the Court grants reargument, it should uphold its prior decision because, *inter alia*:

a) the Court's reliance on the rationale of *van Emrik* was appropriate; and

b) defendants' belated, improper reliance on alleged bureaucratic difficulties in imple-

---

**2.** In addition to the plaintiffs' claims against the City of New York, a claim against defendant Board of Education survived defendants' application for summary judgment. That claim—which is not germane with respect to the present mo-

tion—involves a disputed issue of fact as to whether Sarah was subjected to a strip search by school employees sometime before she was taken into protective custody by the Child Welfare Administration on January 9, 1990.

menting this Court's initial order, misstates the operative facts, and also seems to be premised on the flawed notion that due process should be adjusted to dovetail with established administrative procedures rather than vice versa.

Attention will now be directed to the arguments of counsel, beginning with plaintiffs' claim that defendants' application for reargument and reconsideration is untimely.

## DISCUSSION

### A. Defendants' Motion for Reargument is Untimely

#### I. Date of Motion

On November 25, 1994, defendants filed a motion pursuant to Federal Rules of Civil Procedure "54(b) and 6(b) and Local Civil Rule 3(j), for reconsideration and reargument, on the grounds that in its Memorandum and Order dated September 30, 1994 ... the Court overlooked material facts and controlling authority...." (Defs.' Mot. at 1.)

#### II. Motion for Reargument and Reconsideration

Federal Rule of Civil Procedure 54(b) ("Rule 54(b)") provides, in relevant part, as follows:

Any order or other form of decision ... which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Local Civil Rule 3(j) provides the following time frame and standards for a motion for reargument:

A notice of motion for reargument shall be served within ten (10) days after the docketing of the court's determination of the original motion.... There shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked.

■ The Court notes that the standards controlling a motion for reargument pursuant to Local Rule 3(j) are the same as those for a motion to alter or amend a judgment pursuant to Federal Rule of Civil Procedure 59(e). *In re New York Asbestos Litig.*, 847 F.Supp. 1086, 1141 (S.D.N.Y.1994) (citations omitted). To be entitled to reargument under either of these rules, the movant "must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion." *Id.* The Court first turns its attention to whether or not defendants' motion for reargument was timely filed.

#### III. Untimeliness of Defendants' Motion

Again, Local Rule 3(j) provides that a motion for reargument "shall be served within ten (10) days after the docketing of the court's determination of the original motion...."

To be timely pursuant to Local Rule 3(j), defendants' motion for reargument should have been served on or before October 17, 1994.[3] As previously indicated, defendants' motion was not served until November 25, 1994. Therefore, it is clearly untimely. Defendants, conceding the same, "request that this Court, in its discretion, and pursuant to Federal Rule of Civil Procedure 6(b), grant

3. The day of docketing, October 4, is not included in the computation of the ten (10) days. *See* Fed.R.Civ.P. 6(a) ("In computing any period of time prescribed or allowed by these rules, by the local rules of any district court, ..., the day of the act, event, ... from which the designated period of time begins to run shall not be included.") Additionally, the following days are not included in the computation of defendants' ten (10) days: October 8 (Saturday); October 9 (Sunday); October 10 (Columbus Day). *See id.* ("When the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation.") Finally, because the last day of the allowable ten days, October 15, was a Saturday, the ten day period ran until the end of Monday, October 17. *See id.* ("The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday ..., in which event the period runs until the end of the next day which is not one of the aforementioned days.")

them an extension of time and accept this motion for reconsideration despite its untimeliness under Local Civil Rule 3(j)." (Defs.' Mem.Supp. at 5.)

## IV. Rule 6(b) Extension Request

■ Federal Rule of Civil Procedure 6(b) ("Rule 6(b)") provides as follows:

When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) ... order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order, or (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect....

Rule 6(b) may furnish the basis for an enlargement of the ten (10) day provision of Local Rule 3(j). *See, e.g., Nysa-Ila Medical and Clinical Servs. Fund v. Salco Trucking Corp.,* No. 90 CIV 5949, 1993 WL 159962 (S.D.N.Y. May 11, 1993) (granting, pursuant to Rule 6(b)(1), and extension of time to move for reargument pursuant to Local Rule 3(j)); *Rudd Beverages, Inc. v. Anheuser-Busch, Inc.,* No. 86 CV 3227, 1990 WL 198732 (E.D.N.Y. Nov. 7, 1990) (denying request for Rule 3(j) extension because movant failed to demonstrate excusable neglect).

■ Because defendants did not request an extension of time to file their motion for reargument until well after the expiration of the ten (10) day period, *see supra* at 610–611, defendants have the burden of showing that their "failure to act was the result of excusable neglect." *See* Rule 6(b)(2). "The determination whether neglect is 'excusable' in a particular case rests with the sound discretion of the district court." *Davidson v.*

*Keenan,* 740 F.2d 129, 132 (2d Cir.1984) (citation omitted).

Against that background, the Court examines the explanation provided by defendants as to why they did not file their motion by October 17, 1994:[4]

1. They did not receive, "apparently due to the lateness of the postal service, the decision and order dated September 30, 1994 ... until ... October 7, 1994";

(Defs.' Mem.Supp. at 3.)

2. upon receipt of the September 30 Order, defendants did not "realize[ ] that the decision had failed to consider the complexities of Family Court practice in the five boroughs of New York City";[5]

(*Id.* at 4.)

3. they had to "receive authorization [to file their motion for reargument] from both the new Commissioner of the Child Welfare Administration and the new General Counsel for the Human Resources Administration." Because both the Commissioner and the General Counsel "had been on the job for only a few weeks at that time, [o]btaining appointments with them and allowing them time to absorb the issues and come to a decision necessarily took somewhat longer than it would have with a Commissioner and Counsel who had been in place for a more extended period and were not already being swamped with briefings and budget crises"; and

(*Id.*)

4. "due to a combination of newly-announced trial schedules and an unexpected death in the immediate family, neither the assigned attorney in the Corporation Counsel's office ... nor his supervisor ... was able to work on

---

4. Defendants indicate that, in order to be timely pursuant to Local Rule 3(j), their motion should have been served by October 10, 1994. (*See* Defs.' Mem.Supp. at 3.) Defendants' calculation of the ten (10) days, however, ignores the operation of Federal Rule of Civil Procedure 6(a); as previously indicated, to have been timely, defendants' motion for reargument must have been served on or before October 17, 1994.

5. Defendants further state that it was not until they "attempt[ed] to put together the necessary step-by-step procedures for caseworkers to follow, [that] they realized" the Court's alleged oversight. (Defs.' Mem.Supp. at 4.)

this motion until another 10 days after the necessary permission was obtained."

(*Id.*)

As a preliminary matter, the Court finds no merit in the first two explanations proffered by defendants as to why they did not file their motion by October 17, 1994. Specifically, the Court opines that defendants' October 7 receipt of the Court's Order dated September 30 was probably *not* "due to the lateness of the postal service," as defendants suggest, (*id.* at 3), but rather was most likely because that Order was not docketed, and consequently was not mailed to the parties, until October 4, 1994. Again, however, the docketing date, not the date of the Order, begins the running for the ten day provision of Local Rule 3(j); therefore, defendants' receipt of the Order a week after the Court signed it did not prejudice defendants *vis-a-vis* the time frame for their filing a motion for reargument. In light of the foregoing, the Court finds no merit to defendants' suggestion that a tardy arrival of their copy of the Court's Order justified their untimely motion. Next, the Court notes that the second explanation proffered by defendants does not merit much discussion. Suffice to say, the Court does not find as "*excusable* neglect" Corporation Counsel's failure to evaluate the September 30 Order in a timely manner so as to make a timely motion for reargument.

The Court now addresses defendants' suggestion that a change in high-ranking New York City officials justifies the late filing of defendants' motion for reargument. Accepting as correct defense counsel's assertion that it was required to receive authorization from both the Commissioner of the Child Welfare Administration and the General Counsel of the Human Resources Administration prior to filing a motion for reargument, there remains the fact that defense counsel could easily have requested, *prior* to October 17, additional time to file its motion. *See* Rule 6(b)(1). Defendants, however, offer no explanation as to why they did not request such an extension.[6] *See Davidson v.*

*Keenan,* 740 F.2d 129, 132 (2d Cir.1984); *Turner v. Hudson Transit Lines, Inc.,* No. 89 Civ. 4252, 1991 WL 123966 (S.D.N.Y. July 2, 1991).

In light of the foregoing, the Court finds that the reasons advanced for defendants' failure to serve a motion for reargument by October 17, or at least to make a request for an extension by that date, do not constitute "excusable neglect" within the purview of Rule 6(b)(2).

## B. *Defendants Have Raised on Reargument Facts and Arguments not Previously Presented to the Court*

Two of the defendants' three arguments proffered as justification for reargument and reconsideration were not previously presented to the Court, to wit, those that pertain to Social Service Law Section 383–b, and to bureaucratic complexities of Family Court practice in the City of New York. No legitimate explanation for that apparent oversight has been provided. Under the circumstances, it would be inappropriate to grant reargument even if, contrary to the fact, movants' application was timely. *See, e.g., Caribbean Trading and Fidelity Corp. v. Nigerian National Petroleum Corp.,* 948 F.2d 111, 115 (2d Cir.1990), citing *Schonberger v. Serchuk,* 742 F.Supp. 108, 119 (S.D.N.Y.1990) ("A party making a motion for reargument may not, under Civil Rule 3(j), advance new facts, issues or arguments not previously presented to the Court."); *Woodard v. Hardenfelder,* 845 F.Supp. 960, 966 (E.D.N.Y.1994) (A party requesting reargument "is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use Rule 3(j) to advance new facts and theories in response to the court's rulings.").

## C. *Had Reargument Been Granted, Court Would Have Adhered to its Original Decision*

### I. Introductory Comment

Defendants' motion for reargument was untimely, and improperly raised new facts

---

**6.** Similarly, the Court notes that although the "combination of newly-announced trial schedules and an unexpected death in the immediate family" of one of the defense attorneys, (Defs.'

Mot.Supp. at 4), surely could have served as a basis for an extension request pursuant to Rule 6(b)(1), defense counsel simply chose not to make such a request.

and arguments in seeking to have the Court reconsider its decision of September 30, 1994. For those reasons, the Court has declined to grant reargument. Typically, of course, that would, and should, terminate the discussion. Here, however, the Court has considered the arguments of defendants on the merits. Given the importance of the subject matter, and that the arguments raised—though generally new—are germane, the Court believes that further analysis is worthwhile. Accordingly, the main arguments shall be addressed, *seriatim.*

II. Inapplicability of Social Services Law Section 383–b to Intrusive, Investigatory Medical Examinations Following a Family Court Act § 1024 Emergency Removal

■ Defendants maintain the Court overlooked New York State Social Service Law Section 383–b in rendering its decision of September 30, 1994.[7] It is the defendants' position that the very wording of that section requires the conclusion that it covers not only medical services which are necessary to address a medical need of the child following a Section 1024 emergency removal, but also *any* medical investigatory procedure—no matter how invasive—utilized in an effort to determine whether the subject child had been a victim of sexual abuse. In pursuing that argument further, the Court is advised that:

"... [A]ny physician who is asked to make an examination for the purpose of confirming or ruling out child abuse, especially sexual abuse, would certainly consider this to be 'medical' service. *See, e.g.,* the 1991 Guidelines for the New York State Department of Social Services and the Department of Health concerning specifically investigations of alleged sexual abuse in which it is stated that 'a complete physical examination should be done'...."

Let us now analyze Section 383–b in the present context, including defendants' position on reargument that it should be read to embrace the gynecological examination of Sarah.

Section 383–b, (entitled "Medical Treatment for Abused or Neglected Children; Consent of Commissioners") provides as follows:

The local commissioner of social services or the local commissioner of health may give effective consent for medical, dental, health and hospital services for any child who has been found by the family court to be an abused child or a neglected child, or who has been taken into or kept in protective custody or removed from the place where he is residing, or who has been placed in the custody of such commissioner, pursuant to section four hundred seventeen of this chapter or section one thousand twenty-two, section one thousand twenty-four or section one thousand twenty-seven of the family court act.

Initially, it should be noted that Section 383–b pertains to children who have been placed in the protective custody of the Commissioner after a judicial adjudication of child abuse or neglect, as well as emergency situations in which children have been removed from their homes prior to such an adjudication with, and sometimes without, prior judicial approval. Sarah's removal falls within the last category. She was taken into protective custody by a caseworker, without parental consent or court authorization, based upon probable cause to believe that her return to her parents would place her in imminent risk of harm, coupled with insufficient time to seek court authorization.

Defendants' argument ignores the manner in which Sarah was placed into the Commissioner's custody, and the nature and purpose of the examination thereafter conducted. Implicit in their position is the notion that a "removal" is a "removal" for purposes of Social Service Law Section 383–b. From that it would follow, for example, that whether a child is in foster care following an adversarial adjudication of abuse, *or* is in the Commissioner's temporary care based upon a unilateral field decision by a caseworker, is

---

7. Defendants did not rely on Section 383–b as a justification for the examination of Sarah in their original motion papers. The only reference at that time to that section was in a footnote pertaining to the issue of qualified immunity. (*See* Defs.' Mem.Supp.Summ.J.Mot. at 32 n. 9.)

irrelevant for purposes of determining the nature and extent of medical services or procedures to which the child may, thereafter, be subjected under Section 383–b. Moreover, for a child removed under Section 1024, it would be of no significance—if defendants' argument is sound—whether the procedure under consideration consisted of taking a throat culture of a youngster with a raspy throat, or subjecting a child to a full gynecological examination for purely investigatory reasons.

The defendants' reading of Section 383–b, wholly independent of Family Court Act Section 1024, suggests some troubling scenarios. Consider, for example, defendants' reliance on the previously quoted excerpt from the 1991 New York State Department of Social Services' Guidelines which are attached as Exhibit A to the Hollander affidavit submitted in support of the motion for reargument. The portion quoted by defendants indicates that "A complete physical examination should be done...." Significantly, the last paragraph of the "MEDICAL EXAMINATION" Section of the 1991 Guidelines, from which the above quotation was taken reads as follows:

> "When an examination is required and all attempts to gain the child's voluntary cooperation have failed the examination may be performed under general anesthesia. However the use of general anesthesia should be viewed as the exception, not the rule."

Few would question the legitimacy of a complete medical examination being conducted as part of an investigation of sexual abuse. Moreover, there may conceivably be circumstances under which the child should be placed under general anesthesia to accomplish that result. However, it undermines the concept of "due process" to opine that a caseworker who has removed a child from her home pursuant to Section 1024 of the Family Court Act could thereafter consent to a gynecological examination of the child, *including the use of general anesthesia towards that end*, without any type of parental involvement or court participation. Yet, acceptance of the defendants' argument necessarily compels that conclusion.

An analysis of the purpose, and pre-conditions, for a Section 1024 removal further underscores the invalidity of the argument urged by defendants. The caseworker took possession of Sarah under Section 1024 of the Family Court Act. A removal under that Section is legislatively authorized solely in emergency situations where "there is not time enough to apply for an order [from the Family Court] under Section one thousand twenty two." [8] *See* Family Court Act Section 1024(a)(ii). If the very foundation for the child's removal was the existence of an emergency, how can that removal justify a non-emergency intrusive investigatory examination conducted after the child is no longer in "harm's way"? In the Court's view, it can not.

Unlike a child who is placed in foster care with parental consent, or following an adjudication of neglect or abuse, a Section 1024 removal is meant to be a brief interim measure until such time as the parties can present their respective positions to a Family Court judge. Thus, a parent must be immediately advised of the right to challenge the removal at a Section 1028 hearing, which hearing, unless good cause is shown, *must* be held within three days of the parents' application for the child's return. *See* Family Court Act Section 1028(a). Moreover, a 1024 removal must be followed by the prompt filing of a petition by the child protective agency that took the child to assure that the court will be involved in the process should the parents not seek the child's return.

---

**8.** Family Court Act Section 1022 authorizes a Family Court judge to permit the temporary removal of a child from his or her home in an emergency situation, without parental consent, when "there is not enough time to file a petition and hold a preliminary hearing...." That Section further provides, in subsection (c):

> The family court, before the filing of a petition under this article, may enter an order ...

authorizing a physician or hospital to provide emergency medical or surgical procedures, if (i) such procedures are necessary to safeguard the life or health of the child; and (ii) there is not enough time to file a petition and hold a preliminary hearing under section one thousand twenty-seven.

Defendants' sweeping interpretation of Section 383-b is premised on their reading of the statute, supplemented by reference to the previously mentioned "1991 State Guidelines." [9] In seeking reargument, defendants maintain that if the Commissioner lawfully has custody of a child—whether pursuant to Section 1024 or any other section of Article 10 of the New York State Family Court Act—Section 383-b gives her authority "to consent to *any* type of medical services, not just those that are medically 'indicated' for treatment purposes, but also those that may be medically necessary to rule out or confirm such conditions as battered child syndrome [10] or sex abuse, as here" (emphasis added). (Defs.' Rep.Mem. at 5 n. 1.) To read the statute so broadly in the present case would represent an unwarranted application [11] of the statute, given the Section 1024 character of the removal, and the highly invasive, investigatory nature of the medical procedure involved.

In sum, had defendants' present argument regarding Section 383-b been advanced initially, it would not have changed the conclusions set forth in the September 30, 1994 order.

### III. Factual Matters Said to Have Been Overlooked by the Court

Accompanying defendants' motion for reargument, is the affidavit of Charles A. Hollander, the acting Deputy General Counsel for Family and Children Services in the Offices of Legal Affairs of defendant New York City Human Resources Administration. That affidavit contains information not previously presented by the movants, including

statements about the *de facto* Family Court procedures for obtaining judicial authorizations under Article 10 of the Family Court Act within the City of New York.

Plaintiffs, rightfully so, object to this new factual matter being presented to the Court on a motion for reargument. Firstly, as plaintiffs note, Rule 3(j) provides that "no affidavits shall be filed by any party unless directed by the Court." No such direction was issued by the Court, nor was prior permission to file such an affidavit requested. Indeed, defendants have raised for the first time the impracticality of a caseworker obtaining judicial approval before ordering an intrusive investigatory medical examination of a child removed pursuant to Family Court Act Section 1024.

Notwithstanding the legitimacy of the plaintiffs' position that it is improper to present new arguments, based on new facts, in a reargument format, the Court will briefly discuss its prior ruling against the backdrop of what is represented to be the "actual Family Court Practice in New York City."

To place that discussion in context, however, a synopsis of certain portions of the September 30, 1994 decision is required. In that decision, the Court found that Sarah's removal constituted a seizure within the purview of the Fourth Amendment. (*See* Sept. 30, 1994 Order at 23.) That determination gave rise to the question of what standard should be applied in judging the constitutionality of a child's pre-trial removal from his or her home in instances of suspected child abuse. *Id.* at 24. Must probable cause be present, or will some lesser standard—such as rea-

9. *See* text, 15, 17, 18, *supra.*

10. The investigatory medical examination in *van Emrik* (discussed, *infra*) was to determine whether the thirteen month old baby had suffered prior fractures which, if found, would tend to confirm the suspicion that he was a battered child.

11. A question about the constitutionality of Social Service Law Section 383-b was broached for the first time in Defendants' Memorandum in Support of Motion to Reconsider, at 10 n. 4 thusly: "If, upon such reconsideration, this Court should be inclined to hold Social Service Law Section 383-b in contrary to the Fourth or

Fourteenth Amendment, defendants respectfully request that a final determination on this point be deferred and that the Attorney General of the State of New York, as well as the parties to this case, be given an opportunity to brief the issue of the constitutionality of the state statute in this context."

The Court is not questioning the constitutionality of Section 383-b, although it has concluded that defendants' reliance on the statute, given the facts at bar, is misplaced. However, since defendants' motion for reargument has been denied, notice to the New York State Attorney General, and further briefing from the parties on this belatedly raised issue would serve no purpose and, thus, has not been ordered.

sonable suspicion—suffice? Is a warrant always required?

Given the virtual absence of appellate authority directly on point, the Court considered a host of factors in endeavoring to fashion appropriate answers to those questions, including the likely effects that the various alternative standards—and a warrant requirement—would have on society's efforts to address the child abuse and neglect problem.[12] As a part of that process, the Court observed

> [t]hroughout this decision, the word "warrant" and the term "judicial authorization" will be used interchangeably as synonyms, with the understanding that a judicial authorization in the present context, and thus a "warrant," might consist of, *inter alia* an oral court order given over the telephone, followed by a confirmatory written order. Parenthetically, such a practice was often utilized—with the telephone call being taped—in the Family Court of Suffolk County for Section 1022 applications under the Family Court Act ... when the author of this opinion served in that court in the early to mid–1980s.

*Id.* at 24 n. 7.

In response to that footnote from the original decision, defendants now proffer that

> [a]s shown by the Affidavit of Charles A. Hollander ... it is never possible in New York City to obtain judicial authorization by telephone, or outside limited business hours on weekdays, by any method at all. Thus, the actual burdens on the government in carrying out its mandates on child abuse investigations are far greater than

the Court's analysis in the September 30th decision assumed.

(Defs.' Mem.Supp. at 2.)

Firstly, it should be noted that the footnote targeted by defendants—equating the word "warrant" with the term "judicial authorization"—pertains solely to the warrant requirement of the Fourth Amendment. Contrary to defendants' belief, (*id.* at 5–6), it is not meant to relate to the discussion of plaintiffs'. multiple claims predicated on the Fourteenth Amendment.[13] In that regard, the Court found that due process requires—as a pre-condition to the type of invasive, purely investigatory examination conducted here—that the Commissioner of Social Services obtain judicial authorization for the procedure, issued after both notice, and an opportunity to be heard, has been furnished to the non-consenting parents. (Sept. 30, 1994 Order at 19–21.)

Defendants, as noted previously, have voiced concern about their ability to establish telephone contact with Family Court judges in the five burroughs outside of regular business hours. Presumably, the perceived administrative burdens are magnified when the court's Fourteenth Amendment concerns are factored into the equation. For that reason, the next subject to be discussed will be the claimed burden associated with adjusting existing procedures to dovetail with constitutional requirements.

Defendants have advised the Court that for the period from July 1993 to June 1994 nearly 3400 reports of alleged child sexual abuse were received by the City, with approximately 42% of that number being received at night, or on weekends or holidays. Moreover, each report typically involved

---

**12.** The Court concluded that "probable cause" is the applicable standard under the Fourth Amendment, and that a "warrant"—in the sense of prior written or oral judicial authorization—is required for non-emergency search or seizure. (Sept. 30, 1994 Order at 30.)

**13.** Defendants' misperception is traceable to the introductory clause of the footnote which—in explaining that the terms "warrant" and "judicial authorization" should be treated as synonymous—reads "[t]hroughout this decision," rather than throughout *this portion* of the decision. Be that as it may, however, it should be clear that

footnote 7 does not modify, or otherwise affect, the Court's specific holding that "due process" requires judicial authorization for invasive, purely investigatory medical examinations, given after the parents have been notified and provided with an opportunity to be heard. *See, e.g.,* Sept. 30, 1994 Order ("[Defendants'] ... argument trivializes the constitutional implications of the State subjecting a person to an investigatory, intrusive medical examination without notice, and an opportunity to be heard, within the context of a judicial proceeding."); *see also id.* at 19–21.

more than one child. (Defs.' Not.Mot. Ex. A at 4–5 (¶ 12).) Those numbers are certainly substantial. If parental and court involvement is a precondition to a child being subjected to a purely investigatory, invasive medical examination, presumably more children would be placed in temporary foster care, and as well as increasing the periods of separation for the involved children from their parents would increase.

However, it appears likely that the number of children who would be prospectively impacted by this Court's decision would fall far short of the number of reports received in any given year, because:

1.  many reports may be summarily determined to be unfounded following an interview with the child and his or her parents;

2.  some parents may be expected to consent to a medical examination if assured that a family member or other loved one may be present to comfort the child, and in view of the fact that a failure to consent could result in the child being in foster care for a few days;[14] and

3.  in some instances, the nature of the child's physical complaints and/or other information may not only justify an emergency removal, but may also indicate that an *immediate* medical examination is required to address an apparent or probable emergency medical need of the child.

In sum, the anticipated administrative problems cited by defendants, while significant, do not appear to be of the magnitude or character suggested. In any event, juxtapositioned against those concerns are fundamental constitutional rights. As noted in *Doe v. Renfrow*, in another context "[i]t does not require a constitutional scholar to conclude that a nude search of a thirteen-year old child is an invasion of a constitutional right of some magnitude. More than that: it is a violation of any known principle of human dignity." 631 F.2d 91, 92–93 (7th Cir.

1980), *cert. denied*, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981). The resulting tension between those competing interests would have resolved by the Court in favor of the Tenenbaums even if, contrary to the fact, the information presented by defendants in support of their current motion had been made available in the first instance. Which is to say, had the supposedly "overlooked facts" been provided initially, the order of September 30, 1994 would not have been substantively different than as issued.

IV.  Applicability to Present Case of Rationale Espoused in *van Emrik v. Chemung County Dep't of Social Servs.* Regarding Investigatory Examinations of Children by Public Officials

The last major ground urged by defendants in seeking reargument is that the Court misunderstood Chief Judge Newman's comments regarding the constitutional implications of investigatory medical procedures ordered by state officials during child abuse investigations. In support of that argument, defendants underscore that in *van Emrik*, the caseworker had not taken the child into protective custody before ordering the investigatory long-bone x-rays, and issued the order based upon Social Service Law Section 416 which permits persons required to report cases of suspected child abuse to authorize x-rays "if medically indicated." In contrast, Sarah had been taken into custody before she was subjected to an investigatory examination and defendants seek to justify their conduct under Social Service Law Section 383–b, not Section 416 of that statute.

The distinctions between *van Emrik* and the present case are noteworthy. The question remains, however, whether those distinctions render the following excerpt from *van Emrik* irrelevant for present purposes:

We believe the Constitution assures parents that, in the absence of parental ·con-

---

14.  The statutory scheme embodied in Article 10 of the New York State Family Court Act is geared to provide expedited responses to problems associated with suspected cases of child abuse and neglect. In those instances in which a parent declines to consent to an invasive, investigatory examination of his or her child, a court review—

with an opportunity for the parent to be heard—could be readily conducted, possibly as part of a Section 1028 hearing. That section, it will be recalled, mandates that a hearing must be commenced within three days of a parent's demand for the return of a child following an emergency removal.

sent, x-rays of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances. *Cf. United States v. Allen,* 337 F.Supp. 1041 (E.D.Pa.1972) (requiring search warrant for x-ray of criminal suspect); *State v. Mabon,* 648 S.W.2d 271 (Tenn.Crim.App.1982) (same); *see also United States v. Ek,* 676 F.2d 379, 382 (9th Cir.1982) (permitting x-ray incident to border detention only on "clear indication that suspect is concealing contraband"). Such notice and hearing will afford the judicial officer an opportunity to assess the evidence prompting the state official's request and to ascertain from the parents pertinent facts bearing on the appropriateness of the procedure. For example, inquiry might disclose that sufficiently thorough x-rays had recently been taken and were readily available for inspection or that the extent of radiation contemplated posed an unusual risk to the particular child.

In the Court's view, the rationale embodied in *van Emrik* bears directly on plaintiffs' constitutional claims. The basis for that conclusion is threefold:

1. A perusal of the facts in *van Emrik* indicates that the caseworker in that case had probable cause to effect a Family Court Act Section 1024 removal. Indeed, later on the same day that the x-rays were taken, a court ordered emergency removal was effected, apparently with no changed circumstances having occurred in the interim. It appears that the investigatory x-rays were negative. Of course, compliance, or the lack of compliance with a state statute is not the yardstick against which to assess a claimed federal constitutional violation. Yet, it is interesting that the caseworker in *van Emrik* could just as well have invoked Sections 1024 and 383–b, instead of Social Service Law Section 416, as the predicate for her actions. Clearly, the character of her incantations is not a ground to ignore the insightful analysis

in that decision in evaluating the due process claims of the Tenenbaums;

2. Based on the facts and arguments presented by the parties with respect to the summary judgment motions, the gynecological examination of Sarah—like the examination of the child in *van Emrik*—was not conducted "to provide medical treatment to the child, but to provide investigative assistance to the caseworker." *Id.* at 867; and

3. Here, as in *van Emrik,* time permitted parental and judicial involvement prior to the investigatory medical examination being conducted.

In conclusion of this point, *van Emrik,* although distinguishable, is nonetheless germane to the issues framed in the case at bar.

### CONCLUSION

Defendants' motion for reargument was untimely, and presented facts and issues not originally advanced for the Court's consideration. For those reasons, the motion was denied. Nonetheless, given the importance of the subject matter, a number of defendants' arguments have been discussed. In each instance, however, those arguments—although well presented—would not have changed the substance of the Court's original order of September 30, 1994.

SO ORDERED.