193 F.3d 581 (2nd Cir. 1999)
 MARC TENENBAUM and MARY TENENBAUM, individually and on behalf of SARAH TENENBAUM, an infant, Plaintiffs-Appellees-Cross-Appellants,
v.
NAT WILLIAMS, individually and as a caseworker, Child Welfare Administration, VERONICA JAMES, individually and as a caseworker, Child Welfare Administration, DOBY FLOWERS, individually and as Commissioner of Social Services of the City of New York, and BROOKE TRENT, individually and as Deputy Commissioner of Social Services of the City of New York, Defendants-Cross-Appellees,
NEW YORK CITY, Defendant-Appellant-Cross-Appellee,
MARVA LIVINGSTON, as Commissioner of Social Services of the City of New York, CLAUDE MEYERS, as Deputy Commissioner of Social Services of the City of New York, Appellants-Cross-Appellees,
and
NEW YORK CITY BOARD OF EDUCATION, Defendant.
 Docket Nos. 97-9488(L), 97-9554(XAP)
August Term, 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: September 9, 1998
Decided: October 13, 1999
 
 Appeal and cross-appeal from a judgment of the United States District Court for the Eastern District of New York (DenisR. Hurley, Judge) in plaintiffs' action against the defendants under 42 U.S.C. 1983 (i) awarding plaintiffs damages on their claims against some of the defendants on the grounds that (a) the plaintiffs' and their daughter Sarah's procedural due-process rights were violated by the performance of a medical examination on Sarah in connection with child-abuse allegations against her father without the plaintiffs' permission or court authorization, and (b) Sarah's Fourth Amendment right to be free from unreasonable searches was violated by the same examination; and (ii) granting defendants' motion for summary judgment as to, inter alia, (a)plaintiffs' claims that their and Sarah's procedural due-process rights were violated by the removal of Sarah from school for the purpose of conducting the medical examination, (b) plaintiffs' claim that Sarah's Fourth Amendment right to be free from unreasonable seizures was violated by her removal from school, (c)plaintiffs' claims that their and Sarah's substantive due-process rights were violated by Sarah's removal from school, (d) plaintiffs' claims under state law, and (e) plaintiffs' claims against the individual defendants because all such claims were barred on the grounds of qualified immunity. Plaintiffs also challenge the district court's award of damages as insufficient to compensate them and Sarah for the constitutional violations they suffered.
 Affirmed in part, vacated in part, and remanded.
 
 
 1
 Judge Jacobs concurs in part and dissents in part in a separate opinion.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 
 
 2
 CAROLYN A. KUBITSCHEK, Lansner & Kubitschek, New York, NY (David J. Lansner, Christopher S. Weddle, Charles Park, legal assistant, on the brief), for Appellees-Cross-Appellants.
 
 
 3
 ELLEN RAVITCH, Assistant Corporation Counsel of the City of New York, New York, NY (Jeffrey D. Friedlander, Acting Corporation Counsel of the City of New York, Stephen J. McGrath, Bruce Rosenbaum, of counsel), for Appellants-Cross-Appellees and Defendant-Appellant-Cross-Appellee.
 
 
 4
 Diane Redleaf, Lehrer & Redleaf, Chicago, Ill., for Amicus Curiae National Coalition for Child Protection Reform.
 
 
 5
 Before: McLAUGHLIN, JACOBS and SACK, Circuit Judges.
 
 SACK, Circuit Judge:
 
 6
 On Tuesday, January 9, 1990, at about noon, a caseworker from the New York City Child Welfare Administration (the "CWA") removed five-year-old Sarah Tenenbaum from her kindergarten class at P.S. 230 in Brooklyn, New York, pursuant to the emergency removal provisions of New York Social Services Law 417[1] and New York Family Court Act 1024,[2] without court order and without notifying or receiving authorization from either of her parents, Marc and Mary Tenenbaum (the "Tenenbaums"). Sarah was taken to the emergency room at Coney Island Hospital where a pediatrician and a gynecologist examined her for signs of possible sexual abuse. When they found none, she was returned to her parents. The case was abandoned as "unfounded."
 
 
 7
 The Tenenbaums brought suit in the United States District Court for the Eastern District of New York against, inter alia, New York City (the "City"), the CWA, and CWA employees. The City appeals from a money judgment against it in the district court (Denis R. Hurley, Judge) based on the district court's finding that the medical examination performed without either parental consent or court order deprived the Tenenbaums and their daughter of procedural rights guaranteed by the Due Process Clause of the Fourteenth Amendment, and infringed Sarah's right to be free from unreasonable searches under the Fourth Amendment applied to the States through the Fourteenth. The Tenenbaums, for themselves and their daughter, cross-appeal from the judgment of the district court insofar as it granted defendants' motion for summary judgment dismissing their claim that the defendants' removal of Sarah from school without their consent or court authorization was a violation of their and Sarah's procedural and substantive rights under the Due Process Clause of the Fourteenth Amendment. They also appeal the court's holding that Sarah's removal from school was, as a matter of law, not a violation of her right under the Fourth Amendment, as applied to the States through the Fourteenth, to be free from unreasonable seizures. Further, the Tenenbaums challenge the district court's finding on summary judgment that the individual defendants are entitled to qualified immunity on all the claims against them. The Tenenbaums also contend that their state-law claims should not have been dismissed. Finally, the Tenenbaums challenge the district court's damage award, arguing that it is insufficient to compensate them for the constitutional violations they suffered.
 
 
 8
 We affirm the judgment insofar as it holds that the medical examination violated the Tenenbaums' and Sarah's procedural due-process rights and Sarah's Fourth Amendment rights and awards damages therefor. We disagree with the Tenenbaums that there is a triable issue of fact as to whether Sarah's removal violated substantive rights accorded by the Due Process Clause, and we affirm that part of the district court's judgment. We conclude, however, that there is a triable issue of fact as to whether the defendants' removal of Sarah from school was contrary to the procedural requirements of the Due Process Clause and to Sarah's right to be free from unreasonable seizures under the Fourth Amendment. Because we also agree with the district court that the individual defendants are entitled to qualified immunity, however, we vacate in part and remand only with respect to the City. We affirm the district court's award of damages, recognizing that the court may make an additional award should the Tenenbaums prevail on the claims that we remand for trial.
 
 Background
 
 9
 The facts underlying this appeal are largely undisputed. Five-year-old Sarah Tenenbaum, a kindergartner at P.S. 230 in Brooklyn, was "developmentally delayed" and afflicted with "elective mutism" -- only rarely would she speak to others outside of her home. In school, non-verbal or limited verbal communication was therefore typical. Sarah's teacher, Mary Murphy, was in her third year as a teacher, her first as a kindergarten teacher. Sarah communicated with Murphy by showing her pictures she (Sarah) had drawn or by speaking in one- or two-word sentences.
 
 
 10
 On Thursday, January 4, 1990, Sarah slept while her class was being told a story and attendance was being taken. When she awoke, she was crying. Murphy asked Sarah why; Sarah did not respond. Murphy persisted, asking Sarah whether anyone in the class had hurt her. Sarah shook her head "no." When Murphy asked whether someone at home had hurt her, Sarah nodded "yes." Then, according to Murphy, she "went down the list of people that were in [Sarah's] life . . . all of which [Sarah] shook her head, no, to. When [Murphy] asked [Sarah] if her father was hurting her, her eyes welled up in tears and she shook her head, yes, and she started to really cry."
 
 
 11
 Later that day, Murphy talked to Sarah again and asked Sarah to indicate on a doll she was holding where Sarah was being hurt. Sarah pointed to the groin area of the doll. In order to make sure she was not misunderstanding Sarah, Murphy asked Sarah to indicate again where she was being hurt and Sarah again pointed to the doll's groin area. Murphy did not report the incident that day.
 
 
 12
 During the following day, Friday, January 5, according to Murphy, Sarah drew a picture of two figures. Murphy asked Sarah what was happening in the picture and Sarah said "Sarah and . . . Daddy kneeling, hurt," and then fell silent.
 
 
 13
 Murphy reported Sarah's behavior to her superiors at P.S. 230 as required by sections 413 and 415 of the New York Social Services Law.[3] She also reported that Sarah often slept in class and that she did not interact with other children. A guidance counselor at P.S. 230 in turn reported the matter by telephone to the New York State Department of Social Services' Central Register of Child Abuse and Maltreatment that day, also as required by law.
 
 
 14
 An operator at the State agency made a record of the counselor's call on a department "Form 2221": "Sarah is speech and language delayed. Sarah is unable to stay awake during the day. Ch[ild] often naps off and on all day. Ch[ild] is nervous and withdrawn. Ch[ild] is afraid of fa[ther]. Fa[ther] hurts her vaginal area at night." The department telecopied the Form 2221 to defendant Nat Williams, a supervisor in the child protective unit of the CWA in Brooklyn. Williams received it at about noon that day, Friday.
 
 
 15
 Williams then met with a recently hired provisional caseworker, defendant Veronica James, and assigned her to the Sarah Tenenbaum case. Williams instructed James to contact Sarah's teacher, Murphy, about the allegations contained in the Form2221. James attempted to reach Murphy at the school, but Murphy had left for the weekend.
 
 
 16
 Williams also told James to visit the Tenenbaums' home that evening to examine the child for marks and bruises, to assure herself that Sarah's living conditions were acceptable, and to discuss with the Tenenbaums Sarah's sleeping in school and her delayed development. Williams issued explicit instructions to James not to raise the issue of sexual abuse.
 
 
 17
 That evening, James, accompanied by colleague Thomas O'Connell, who was sent along by Williams in case any male children might be involved, arrived unannounced at the Tenenbaums' home. James told the Tenenbaums that she and O'Connell were investigating a report that Sarah was developmentally delayed and was sleeping in school. In accordance with Williams' instructions, they did not mention the real reason they were there -- the reports of possible sexual abuse.
 
 
 18
 The Tenenbaums discussed Sarah's developmental problems with the caseworkers and gave James the names of several physicians who regularly treated Sarah and her younger brother. The Tenenbaums, as requested, also furnished James with signed releases permitting CWA personnel to review the doctors' records. The Tenenbaums permitted James and O'Connell, respectively, to inspect Sarah's and her brother's partially uncovered bodies for marks or bruises. The caseworkers found no signs of maltreatment on either child. James and O'Connell also learned that Mrs. Tenenbaum, a nurse, sometimes worked during the evenings but that Mr. Tenenbaum, a plumber for the City school system, was home during the evenings. The Tenenbaum home seemed to the caseworkers to be neat and well-cared for.
 
 
 19
 There is a dispute about what the caseworkers told the Tenenbaums would happen next. Williams had told James, during their initial meeting about the case earlier in the day, to instruct the Tenenbaums that they were to contact Williams the following Monday. James testified that she delivered the message. The Tenenbaums each claimed that James made no such request and had not left a telephone number where she, O'Connell, or their supervisor could be reached. In any event, not having been told about the sexual abuse charges, the Tenenbaums did not know that Mr. Tenenbaum was suspected of wrongdoing or that anyone thought that Sarah might be in imminent danger of physical harm.
 
 
 20
 James and O'Connell left the Tenenbaum home, James reported their observations to Williams by telephone, and the caseworkers went home for the weekend. Sarah remained at her home with her parents. Neither Williams, James, O'Connell nor anyone else took further action in Sarah's case over the weekend. Although the CWA maintains an emergency children's services unit that is on call nights and weekends, no one contacted it about the Tenenbaum situation. Neither did Williams, James, O'Connell or anyone else then or during the week that followed try to reach Sarah's doctors to discuss the possibility of abuse. There is similarly no indication that anyone attempted to find teacher Murphy at her home or elsewhere over the weekend to try to determine the nature and extent of the evidence that Sarah had been abused.
 
 
 21
 On Monday, January 8, James visited P.S. 230. She met Murphy, who reiterated what had happened the week before. James tried to question Sarah directly; Sarah did not respond. Murphy then asked Sarah if her father touched her in the vaginal area and hurt her. Sarah shook her head "no." But Sarah shook her head "no" to every question Murphy asked in James' presence, including whether her mother bathed her.
 
 
 22
 James returned to her office and reported to Williams on her visit. Williams testified that after being told by James that Murphy had confirmed the information contained on the Form 2221 received Friday, he decided to wait for the call he expected from Mr. or Mrs. Tenenbaum. The call never came. The Tenenbaums, as already noted, deny that they had ever received any request to contact Williams. Neither did Williams call the Tenenbaums even though he knew how to reach them. After James completed her report, Williams told her to work on other cases for the remainder of the day.
 
 
 23
 Based on what he termed his "assessment of the case including Miss Murphy's account" and the failure of the Tenenbaums to contact him, Williams decided that on Tuesday, the day after he received James's report, he would have Sarah removed from school in order to have her physically examined "to rule out [the possibility of] sexual abuse."[4] James says that at her meeting with Williams on Monday she was "instructed that [James] would have to take the child to the hospital." When asked why she did not remove Sarah until the next day, James testified that she did not recall. Williams testified that he did not decide until Tuesday morning to have Sarah removed from school. "I decided just to do it on Tuesday."
 
 
 24
 Although CWA lawyers were on staff at Williams' and James' office, neither sought legal advice before removing Sarah from school and subjecting her to the examination. Neither Williams nor James made an attempt-- indeed, no one considered making an attempt-- to obtain parental consent for a physical examination of Sarah as provided by 1021 of the New York Family Court Act.[5] And no one considered seeking a court order for her removal and examination under 1022 of that Act[6] even though Williams understood that such an order could be obtained within a day.[7]
 
 
 25
 Williams' decision to proceed on an "emergency" basis rather than to seek parental consent or a court order was not aberrational. Although legal counsel was readily available, Williams "seldom" sought it before effecting a child's removal. Williams indicated that only if CWA had "decided to keep" Sarah following her removal and physical examination would court action have been sought. He described as standard office procedure the removal of a child first and the seeking of a court order later, if and after abuse was established. See also N.Y. Fam. Ct. Act 1022 (McKinney 1999), Practice Commentaries, Douglas J. Besharov at 10 (stating that it is "common to take emergency protective action without prior court review" in New York City in contrast with procedures used in other parts of the State). In the district court, the defendants "stipulated that the removal of Sarah and her subsequent examination for suspected child abuse were done pursuant to CWA policy." Tenenbaum v. Williams, 91-CV-0037 (DRH), Memorandum and Order at 2-3 (E.D.N.Y. Oct. 21, 1997). And at oral argument on this appeal, counsel for the defendants, when asked whether the City condoned the defendants' actions, responded "Yes, and they do it routinely. That is the policy."
 
 
 26
 Following Williams' instruction, James went to P.S.230 on Tuesday, January 9 at about noon, without court order or parental consent, and effected an "emergency" removal of Sarah for the purpose of determining whether she had been sexually abused. The school, as a matter of policy, consented.[8]
 
 
 27
 James, by herself, took Sarah to the emergency room at Coney Island Hospital where, after several hours' delay, Sarah was examined by both a pediatrician and a gynecologist. The gynecological examination included the insertion of a cotton swab in Sarah's vagina and anus. No evidence of sexual abuse was discovered, although the hospital report stated that it could not be ruled out.
 
 
 28
 While James and Sarah were at the hospital, Williams contacted Mrs.Tenenbaum and told her that Sarah had been taken from school. Mrs. Tenenbaum telephoned her husband and both parents went to Williams' office. When they arrived, Williams confronted Mr. Tenenbaum for the first time with the sexual abuse charge. He heatedly denied it.
 
 
 29
 After Sarah's physical examination was complete, James brought Sarah to the CWA office, where she was returned to her parents sometime between 7:30 and 8:30 that evening. Williams told the Tenenbaums that they could take Sarah home because no evidence of sexual abuse had been discovered. No further action was taken on the charge. Williams ultimately marked Sarah's case "unfounded."
 
 
 30
 In January 1991, the Tenenbaums filed a complaint in the United States District Court for the Eastern District of New York pursuant to 42 U.S.C. 1983 against Williams, James and several other City officials, as well as the City of New York and the New York City Board of Education. The complaint alleged various constitutional and state-law violations by the defendants against the Tenenbaums in both their individual capacities and on behalf of Sarah.
 
 
 31
 The defendants moved for summary judgment and the Tenenbaums cross-moved for partial summary judgment. On September 30, 1994, the district court granted defendants' motion in part and denied it in part. Tenenbaum v. Williams, 862 F. Supp. 962 (E.D.N.Y. 1994) ("Tenenbaum I"). The court concluded that neither the Tenenbaums' or Sarah's substantive due-process claims nor their procedural due process or Fourth Amendment claims based on Sarah's removal were meritorious. Even if they were, the district court held, the individual defendants were entitled to qualified immunity. The court found as a matter of law, however, that the judicially unauthorized medical examination violated the Tenenbaums' and Sarah's procedural due-process rights and Sarah's Fourth Amendment right to be free from unreasonable searches. Although the individual defendants were entitled to qualified immunity on this claim, the City of New York was subject to suit. The court further found that there were disputed factual issues surrounding a separate physical search claim against the Board of Education, a claim the Tenenbaums nonetheless subsequently withdrew. The court dismissed all of the Tenenbaums' state-law claims and denied the Tenenbaums' partial summary judgment motion.
 
 
 32
 The City moved for reconsideration and reargument on November 25, 1994. The district court denied the motion as untimely under local procedural rules, but stated that had reargument been granted the court would have adhered to its original decision -- that Sarah's medical examination violated the plaintiffs' and Sarah's procedural due-process rights and Sarah's Fourth Amendment rights. Tenenbaum v. Williams, 907 F. Supp. 606, 618 (E.D.N.Y. 1995) ("Tenenbaum II"). The City then conceded that the actions of Williams, James and the CWA, which formed the basis of the viable claims, were taken pursuant to City policy and that the City was therefore responsible for them. Tenenbaum v. Williams, 91-CV-0037 (DRH), Memorandum and Order at 2-3 (E.D.N.Y. Oct. 21, 1997) ("Tenenbaum III"). The court held a damages trial on March 10 and 18, 1997. It awarded damages in the amount of $15,000 to Sarah and $1.00 each to Mr. and Mrs. Tenenbaum. Id. at 7-12. These cross-appeals followed.
 
 Discussion
 I. Procedural Due-Process Claims
 
 33
 The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." The Tenenbaums claim that they have a liberty interest in the care, management and custody of their daughter Sarah, and that her removal from school without their consent and without court authorization deprived them of that interest without due process of law. The district court disagreed, finding that reasonable grounds existed for Sarah's emergency removal. Tenenbaum I, 862 F. Supp. at 969-72. The court also found that even had the individual defendants violated plaintiffs' due-process rights, those defendants were entitled to qualified immunity because officials "of reasonable competence could disagree on whether [there was] probable cause" for Sarah's removal. Id. at 972 (internal quotation marks and citation omitted).
 
 
 34
 The Tenenbaums claim a similar liberty interest with respect to their daughter's subjection to a medical examination. The district court agreed. In contrast to its conclusion as to Sarah's removal, the court held that the defendants' actions violated the Tenenbaums' and Sarah's procedural due-process rights as a matter of law. It reasoned that whatever emergency may have existed at the time of Sarah's removal from school, it had abated by the time Sarah was at the hospital. Because there was no emergency, absent parental consent judicial authorization was required by the Due Process Clause. It had not been obtained. Id. at 972-73. The court nevertheless found that the individual defendants were entitled to qualified immunity on this claim too, and granted summary judgment to them on that basis. Id. at 973. The City, to which the qualified immunity defense does not apply, was held potentially liable on this claim and the court denied summary judgment as to it. See id. After the district court denied its motion for reargument, the City conceded that the actions of the CWA caseworkers were taken pursuant to City policy. See Tenenbaum III, at 2-3. A damages trial followed and the court awarded the plaintiffs and Sarah damages on this claim. See Tenenbaum III, at 7-12.
 
 
 35
 On appeal, the Tenenbaums contend that the district court erred when it granted summary judgment for the defendants on the Tenenbaums' claim that, aside from the medical examination, Sarah's removal from school violated their and Sarah's due-process rights. They also challenge the district court's finding that qualified immunity shields the individual defendants from liability. For its part, the City asserts that the district court erred in holding that the medical examination violated the plaintiffs' due-process rights. The Tenenbaums argue that this aspect of the court's decision was correct, but insist that the individual defendants are not entitled to qualified immunity as to this claim.
 
 
 36
 This Court reviews the district court's grant of summary judgment de novo, see Maguire v. Citicorp Retail Servs., Inc., 147 F.3d 232, 235 (2d Cir. 1998), and we construe the evidence in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). We will affirm the decision only if the record indicates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Stuart v. American Cyanamid Co., 158 F.3d 622, 626 (2d Cir. 1998) (quoting Anderson, 477 U.S. at 248), cert. denied, 119 S. Ct. 1456 (1999).
 
 A. Sarah's Removal
 1. Constitutional Violation
 
 37
 "Choices about marriage, family life, and the upbringing of children are among associational rights [the Supreme] Court has ranked as 'of basic importance in our society,' . . . rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." M.L.B. v. S.L.J., 519 U.S. 102, 116 (1996) (internal citation omitted). Parents therefore have a constitutionally protected liberty interest in the care, custody and management of their children. See Santosky v. Kramer, 455 U.S. 745, 753-54 (1982); Hurlman v. Rice, 927 F.2d 74, 79 (2d Cir. 1991); van Emrick v. Chemung County Dep't of Soc. Servs., 11 F.2d 863, 867 (2d Cir. 1990); see also Stanley v. Illinois, 405 U.S. 645, 649-52 (1972) (rights to conceive and raise one's children have been deemed "essential" and "basic civil rights of man"); Prince v. Massachusetts, 321 U.S. 158, 166 (1944) (the custody, care and nurture of the child reside first with the parents); Meyer v. Nebraska, 262 U.S. 390, 399 (1923) (liberty guaranteed by the Fourteenth Amendment includes the right to establish a home and bring up children); Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir. 1977) (recognizing the right of the family "to remain together without the coercive interference of the awesome power of the state"). As a general rule, therefore, before parents may be deprived of the care, custody or management of their children without their consent, due process ordinarily a court proceeding resulting in an order permitting removal must be accorded to them. See Stanley, 405 U.S. at 649, 651; Hurlman, 927 F.2d at 79 (such due process is "generally in the form of a predeprivation hearing"); Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987) (due process "would generally require a predeprivation hearing").
 
 
 38
 At the same time, however, the State has a profound interest in the welfare of the child, particularly his or her being sheltered from abuse. In "'emergency' circumstances," Hurlman, 927 F.2d at 80 (citing Robison, 821 F.2d at 921), a child may be taken into custody by a responsible State official without court authorization or parental consent. "Emergency circumstances mean circumstances in which the child is immediately threatened with harm." Id. (citing Robison, 821 F.2d at 922). "[T]he mere 'possibility' of danger" is not enough. Id. at 81. If it were, officers would always be justified in seizing a child without a court order whenever there was suspicion that the child might have been abused. See id. The law thus seeks to strike a balance among the rights and interests of parents, children, and the State. See Hollingsworth v. Hill, 110 F.3d 733, 739 (10th Cir. 1997); Robison, 821 F.2d at 920.
 
 
 39
 According to the district court, because consent was not obtained[9] and court proceedings not employed, "[t]he pivotal question" is whether James' removal of Sarah from P.S. 230 was an "appropriate response to a legitimately perceived emergency." Tenenbaum I, 862 F. Supp. at 970. The district court found that Williams, who ordered Sarah's removal, had probable cause, i.e., an objectively reasonable basis, to believe emergency circumstances existed because "the substance of what the child communicated to Murphy...is essentially uncontroverted, viz. that Sarah's father hurt her through contact with her vaginal area at night." Id. This was enough to satisfy the district court that as a matter of law there were emergency circumstances that permitted Sarah's removal from school for a physical examination without a court order. See id. at 971. We disagree.
 
 
 40
 While "there is a sufficient emergency to warrant officials' taking [a child into] custody without a prior hearing if [he or she] is immediately threatened with harm," Robison, 821 F.2d at 922 (citation omitted), the converse is also true. If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, ex parte or otherwise,[10] for the child's removal, then the circumstances are not emergent; there is no reason to excuse the absence of the judiciary's participation in depriving the parents of the care, custody and management of their child. If, irrespective of whether there is time to obtain a court order, all interventions are effected on an "emergency" basis without judicial process, pre-seizure procedural due process for the parents and their child evaporates.
 
 
 41
 The decision to remove Sarah from school was made as early as Monday, January 8. She was not taken from school until Tuesday at noon. Defendants concede that a court order could have been obtained in one day. The evidence suggests that the purpose of removing Sarah from school was not to sweep Sarah out of harm's way but rather "to rule out [the possibility that Sarah had been] sexual[ly] abuse[d]." Based on those facts and the others recited in detail above, a properly instructed jury could conclude that at the time the caseworkers decided to remove Sarah, there was reasonably sufficient time, entirely consistent with Sarah's safety, to seek a court order. If there was reasonably sufficient time, there was no emergency. A jury could find that use of emergency, extra-judicial procedures was an infringement of the Tenenbaums' and Sarah's procedural due-process rights.
 
 
 42
 We reiterate the teaching of Doe v. Connecticut Department of Child and Youth Services, 911 F.2d 868 (2d Cir. 1990). The amount of time that elapsed between the report to the CWA, the caseworkers' visit to the Tenenbaum home, or James' visit to the school, on the one hand, and the removal of Sarah on the other, standing alone, proves nothing. If at any time Sarah should have been removed for her protection and there was not then reasonably sufficient time to seek predeprivation judicial authorization, there would have been, as a matter of law, no violation of either the Tenenbaums' or Sarah's due-process rights. A jury could conclude, however, that in the case of Sarah Tenenbaum that time never came.
 
 
 43
 When child abuse is asserted, the child's welfare predominates over other interests of her parents and the State. But "we must be sensitive to the fact that society's interest in the protection of children is, indeed, multifaceted, composed not only with concerns about the safety and welfare of children from the community's point of view, but also with the child's psychological well-being, autonomy, and relationship to the family." Franz v. Lytle, 997 F.2d 784, 792-93 (10th Cir. 1993). And while the paramount importance of the child's well-being can be effectuated only by rendering State officials secure in the knowledge that they can act quickly and decisively in urgent situations and that the law will protect them when they do, there is a critical difference between necessary latitude and infinite license. As the Supreme Court stated in Stanley v. Illinois:
 
 
 44
 The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency.
 
 
 45
 405 U.S. at 656. And as this case may demonstrate, if officers of the State come to believe that they can never be questioned in a court of law for the manner in which they remove a child from her ordinary care, custody and management, it is inevitable that they will eventually inflict harm on the parents, the State, and the child.
 
 2. Qualified Immunity
 
 46
 The determination that Sarah's removal may have been in violation of the Fourteenth Amendment does not end our inquiry with respect to the individual defendants. The district court held that even if an award of summary judgment to all the defendants was inappropriate "vis-a-vis Sarah's removal, the [individual defendants] would still be entitled to such relief under the doctrine of qualified immunity." Tenenbaum I, 862 F. Supp. at 972. We agree.
 
 
 47
 "The qualified immunity doctrine protects government officials from suits seeking to impose personal liability for money damages based on unsettled rights or on conduct that was not objectively unreasonable." Connell v. Signoracci, 153 F.3d 74, 79 (2d Cir. 1998). Government officials "enjoy qualified immunity when they perform discretionary functions if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that [their] acts did not violate these clearly established rights." Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998) (internal quotation marks and citations omitted) (alteration in original).
 
 
 48
 In January 1990, at the time the individual defendants took the actions questioned here, there was little established doctrine as to what steps State officials were constitutionally forbidden to take in seeking to protect children from alleged abuse. This Court recently had occasion to reflect on the dearth of explicit standards in this Circuit applicable to caseworker conduct during child abuse investigations. See Wilkinson v. Russell, 182 F.3d 89, 107 (2d Cir. 1999). None governed the circumstances of this case. To be sure, it was established as a general matter before the events in the instant case that "except where emergency circumstances exist" a parent can "not be deprived" of the custody of his or her child "without due process, generally in the form of a predeprivation hearing." Hurlman, 927 F.2d at 79 (citing Robison, 821 F.2d at 921). But not until today have we specifically held that where there is reasonable time consistent with the safety of the child to obtain a judicial order, the "emergency" removal of a child is unwarranted. We cannot say that this principle was clearly enough articulated in or implied by our case law as of 1990 to require the defendants to answer in damages for their failure to abide by it at that time.
 
 
 49
 The district court, in a thoughtful and thorough opinion, moreover, held that the individual defendants' actions in removing Sarah complied with procedural due-process requirements. While such a conclusion would not entirely preclude us from finding that the individual defendants' actions violated plaintiffs' "clearly established right," the district court's determination in 1994 that no such right existed helps persuade us that in early 1990 the right was not "clearly established." We conclude that the district court correctly determined that the individual defendants were protected by qualified immunity.
 
 
 50
 Because we now hold that it is unconstitutional for state officials to effect a child's removal on an "emergency" basis where there is reasonable time safely to obtain judicial authorization consistent with the child's safety, caseworkers can no longer claim, as did the defendants here, that they are immune from liability for such actions because the law is not "clearly established." But there remains substantial protection for caseworkers under the second prong of the qualified immunity test, so long as it is "objectively reasonable [for them] to believe that [their] acts [do] not violate these clearly established rights." Young, 160 F.3d at 903. "The objective reasonableness test is met -- and the defendant is entitled to immunity -- if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). We continue to recognize such protection to be essential.
 
 
 51
 [P]rotective services caseworkers [must] choose between difficult alternatives . . . . If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights. It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it.
 
 
 52
 van Emrik, 911 F.2d at 866 (footnote omitted); see also Defore v. Premore, 86 F.3d 48, 50 (2d Cir. 1996) (emphasizing the importance of the qualified immunity defense to ensure publicly employed caseworkers the necessary latitude to exercise their professional judgment in matters related to child welfare). We are confident that the doctrine of qualified immunity applied in light of these principles will continue to provide ample protection for caseworkers, enabling them to fulfill their crucial duties safely and effectively. When sued, summary judgment will continue to be readily available to these caseworkers in proper cases under the qualified immunity doctrine.
 
 3. Liability of the City
 
 53
 While the individual defendants are entitled to qualified immunity, the City is not. See Owen v. City of Independence, 445 U.S. 622, 657 (1980); Ferran v. Town of Nassau, 11 F.3d 21, 23 (2d Cir. 1993), cert. denied, 513 U.S. 1014 (1994). In order for a court to impose liability on a municipal defendant under 1983, the plaintiff must identify a municipal "policy" or "custom" from which the alleged injury arose. See Monell v. Department of Social Servs., 436 U.S. 658, 694 (1978). This "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." Board of the County Comm'rs v. Brown, 520 U.S. 397, 403-04 (1997).
 
 
 54
 The City conceded in the district court that both "the removal of Sarah and her subsequent examination" were accomplished pursuant to City policy. Tenenbaum III, at 2-3. This concession was reconfirmed at oral argument on this appeal. If this concession is binding on the City and after trial on remand Sarah's removal is found to have been a violation of the plaintiffs' procedural due-process rights, then the City will be liable for that violation. If for any reason the district court holds that the City is not bound by this concession, however, in order to prevail on their claim that the City is liable for the procedural due-process infringements by the individual defendants based on Sarah's removal, the plaintiffs will also be required to show on remand that the removal was effected pursuant to a City policy or custom.
 
 B. The Medical Examination
 1. Constitutional Violation
 
 55
 The district court found that Sarah's subjection to a medical examination by both a pediatrician and a gynecologist at the request of CWA caseworker James violated Sarah's and her parents' procedural due-process rights but concluded that the individual defendants were qualifiedly immune from liability. The City was not shielded from liability, however, because it conceded that the examination was conducted pursuant to its policy. Tenenbaum III, at 2-3. On appeal, the City challenges the district court's determination that there was a due-process violation. The district court relied largely on van Emrik v. Chemung County Department of Social Services, 911 F.2d 863 (2d Cir. 1990), which held that in the circumstances presented by that case, a court order is constitutionally required before a child may be physically examined at the instance of the government for evidence of abuse. Tenenbaum I, 862 F. Supp. at 972-73. The City argues that the present case is distinguishable. We are unpersuaded.
 
 
 56
 In van Emrik, a seven-month-old child was taken by her mother to a hospital emergency room, where the infant was diagnosed with a spiral fracture of her right leg. The parents expressed their suspicion that the child's babysitter was responsible. The emergency-room physician reported the event to a child abuse "hotline." Its operators transmitted the report to officials at the Chemung County Department of Social Services. An investigation led to inconclusive results about the cause of the child's injury.
 
 
 57
 Before the child was discharged from the hospital, the caseworker-in-charge requested that the attending physician perform a series of long-bone x-rays. The doctor was hesitant to do so because of potential harm caused by radiation. When the caseworker stated that she wanted to see if the child had suffered other fractures that had gone undetected, however, the doctor complied. The parents were not consulted, their consent was not obtained, and no court authorization was sought or received. See van Emrik, 911 F.2d at 864-65. After the x-rays were taken, the child was placed in the temporary custody of the Department of Social Services; this custodial arrangement, effected pursuant to a court order, was not based on anything the x-rays revealed but rather was made because of the caseworkers' fear that the child could be in danger if returned home. The investigation ended without any finding of responsibility for the injury and the child was returned to her parents. See id. at 865.
 
 
 58
 In determining that the administration of the x-rays without the parents' consent or a court order violated the plaintiffs' procedural due-process rights, this Court concluded that the x-rays were not "medically indicated." See id. at 867. The purpose of the x-rays "was not to provide medical treatment to the child, but to provide investigative assistance to the caseworker." Id. Based on this determination, we announced that
 
 
 59
 the Constitution assures parents that, in the absence of parental consent, x-rays of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances.
 
 
 60
 Id.
 
 
 61
 Relying on this holding, the court below found that:
 
 
 62
 Sarah was subjected to intrusive bodily examinations by two strangers, in a strange location, in the absence of a parent or other reassuring figure . . . [and accordingly] plaintiffs have established, as a matter of law, that their procedural due process rights were violated by the manner in which Sarah was subjected to a medical examination on January 9, 1990.
 
 
 63
 Tenenbaum I, 862 F. Supp. at 973. The district court reiterated this holding on the City's motion for reconsideration. See Tenenbaum II, 907 F. Supp. at 617-18. The City contends that van Emrik is distinguishable from this case because (1) the medical procedure administered in van Emrik (long-bone x-rays) was potentially harmful to the child, while the medical procedure in the present case was not, and (2) the x-rays in van Emrik were administered purely for investigative purposes whereas the examination of Sarah's vaginal area was conducted for the purpose of detecting and treating injuries that may have been caused by alleged sexual abuse. We disagree on both counts.
 
 
 64
 First, with respect to the contention that van Emrik's holding does not apply because Sarah was subjected to a gynecological exam rather than long-bone x-rays, we agree with the district court that "[w]hile the child in van Emrik faced the possibility of physical injury, Sarah, almost certainly, did, in fact, experience psychological injury on January 9, 1990." 862 F. Supp. at 973. That likelihood surely could have been anticipated by both Williams and James. Moreover, van Emrik does not confine its holding to x-rays, but instead speaks in broad terms of "medical procedures in aid of child abuse investigations." van Emrik, 911 F.2d at 868.
 
 
 65
 Second, with respect to the City's argument that Sarah's physical examination was medically indicated, the evidence discloses that when Sarah was brought to the emergency room at Coney Island Hospital, doctors were told that she was a suspected victim of sexual abuse by her father. It is undisputed that the gynecological exam that ensued was undertaken for the purpose of determining whether such abuse had occurred. Williams unambiguously so testified. While the purpose was investigative, the method by which the doctors conducted the investigation was, of course, to examine Sarah for injuries consistent with abuse.
 
 
 66
 During the examination of Sarah "to rule out [the possibility of] sexual abuse," injuries might have been found, and if so we would surely expect them to have been treated. But that possibility did not turn an investigative examination into one that is "medically indicated" and designed for treatment. Cf. Chayo v. Kaladjian, 844 F. Supp. 163, 169 (S.D.N.Y. 1994) (interpreting van Emrik to permit unauthorized x-rays that were ordered by a pediatric resident for purposes of diagnosis, not investigation, where child had visible bruise on head); Schwimmer v. Kaladjian, 988 F. Supp. 631, 641 (S.D.N.Y. 1997) (doctor-ordered x-rays where child was covered with ecchymotic lesions were medically indicated, not merely investigative), aff'd, 164 F.3d 619 (2d Cir. 1998) (unpublished table decision).
 
 
 67
 We also agree with the district court that if Sarah had ever been in imminent danger, she was not by the time she was taken to the hospital in the custody of the CWA. The caseworkers were required under van Emrik either to notify the Tenenbaums that Sarah was about to undergo a medical procedure and obtain the approval of either of them or to obtain judicial authorization. They did neither. See Tenenbaum I, 862 F. Supp. at 972.
 
 2. Qualified Immunity
 
 68
 We also agree with the district court that the individual defendants were nonetheless entitled to qualified immunity. Not until van Emrik was decided in August 1990 was the law clear that subjecting a child to invasive investigatory medical examination in the course of an abuse investigation requires a court order absent parental consent. The events in Tenenbaum occurred more than seven months prior thereto. The individual defendants did not, therefore, violate rights that were "clearly established" at the time. See section I.A.2., supra.
 
 II. Substantive Due-Process Claims
 
 69
 The Tenenbaums also contend that Sarah's temporary removal for the purpose of subjecting her to a medical examination violated their and Sarah's substantive due-process rights.[11] The district court granted the defendants' motion for summary judgment on this claim, finding that "defendants' deprivation of the Tenenbaums of their child for a single afternoon for a medical examination did not significantly infringe their fundamental right to live together without interference from the state." Tenenbaum I, 862 F. Supp. at 969. We agree with the district court's conclusion, although we affirm its grant of summary judgment as to the claim brought on Sarah's behalf on different grounds.
 
 
 70
 The Supreme Court has held that [w]here a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."
 
 
 71
 Albright v. Oliver, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J.) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)). "Substantive due process analysis is therefore inappropriate in this case . . . if [the] claim is 'covered by' the Fourth Amendment." County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998). As discussed below, Sarah's removal and her examination constituted a seizure and search, respectively, under the Fourth Amendment and the Tenenbaums have standing to assert a Fourth Amendment-based claim against the defendants on Sarah's behalf. Their claim on Sarah's behalf therefore "must be analyzed under the standard appropriate to [the Fourth Amendment], not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272 n.7 (1997). We affirm the dismissal of the substantive due-process claim brought on Sarah's behalf on this ground.
 
 
 72
 The Tenenbaums do not have-- or at least no longer allege-- cognizable Fourth Amendment claims based on Sarah's examination and removal. See note 13, infra. It is therefore appropriate to analyze whether their claims are redressible as substantive due-process violations. Because we find that they are not, we affirm the district court's grant of summary judgment on those claims.
 
 
 73
 The Tenenbaums and their family have, in general terms, a substantive right under the Due Process Clause "to remain together without the coercive interference of the awesome power of the state." Duchesne, 566 F.2d at 825. We could agree with the Tenenbaums that this right was violated by the defendants in this case only if we were to conclude that the removal of Sarah for several hours under these circumstances would have been prohibited by the Constitution even had the Tenenbaums been given all the procedural protections to which they were entitled. See Daniels v. Williams, 474 U.S. 327, 331 (1986) (substantive due-process rights bar "certain government actions regardless of the fairness of the procedures used to implement them."). The substantive rights arising out of the Due Process Clause are not so broad.
 
 
 74
 "[T]he touchstone of due process is protection of the individual against arbitrary action of government." County of Sacramento, 523 U.S. at 845 (internal quotation marks and citation omitted). Substantive due-process rights guard against the government's "exercise of power without any reasonable justification in the service of a legitimate governmental objective." Id. at 846 (citation omitted). "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'" and therefore unconstitutional. Id. (citation omitted). There is no basis for us to hold that a temporary separation of Sarah from her parents in an effort to obtain assurance that she had not been abused would have been so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection. No judicial proceedings were in fact employed here, but that is relevant only to our conclusion that the Tenenbaums and Sarah may have been deprived of procedural due process, not to whether their substantive due-process rights were implicated.
 
 
 75
 Thus, in Joyner v. Dumpson, 712 F.2d 770 (2d Cir. 1983), we analyzed whether New York's mandatory custody transfer requirement as embodied in N.Y. Soc. Serv. Law 358-a and 384-a violated plaintiffs' right to family integrity protected by substantive rights arising out of the Due Process Clause. In disagreeing with the district court's conclusion that it did, we emphasized that the custody transfer contemplated would not deprive parents completely of the right to rear their children. We stated that such a transfer "does not result in parents' wholesale relinquishment of their right to rear their children," because there the parents retained substantial responsibility for important decisions in their child's life. Id. at 778.
 
 
 76
 Here, Sarah was taken from P.S. 230 at about noon on January 9, 1990 and was returned to her parents hours later. The temporary separation of Sarah from her parents did not result in the Tenenbaums' wholesale relinquishment of their right to raise Sarah. The interference was not severe enough to constitute a violation of their substantive due-process rights.[12]
 
 
 77
 The Tenenbaums aver that the duration of an imposed separation has no bearing on the substantive due-process analysis. The cases on which they rely, however, are inapposite. In United States v. Langer, 958 F.2d 522 (2d Cir. 1992), for example, we determined that police detention even for ten to fifteen minutes was "constitutionally significant" for purposes of 18 U.S.C. 242. See id. at 524. The right implicated in Langer was the Fourth Amendment right to be free from unreasonable seizures and in that context we recognized that "even a brief seizure is a serious intrusion upon the sanctity of the person." Id. (internal quotation marks omitted). Similarly, in Davis v. Mississippi, 394 U.S. 721 (1969), the Supreme Court found that the detention of the defendant at police headquarters, even for a short period of time, violated the Fourth Amendment where there was no probable cause for arrest. The Tenenbaums ask us to extrapolate from Langer and Davis a rule that the separation of child and parent for a short period of time, no matter what procedural protections accompany it, constitutes a violation of the right to family integrity. There is no basis for us to do so. It does not follow from the principle that brief seizures of people may be unreasonable and therefore violate the Fourth Amendment that brief removals of children from their parents to protect them from abuse are "without any reasonable justification in the service of a legitimate governmental objective," County of Sacramento, 523 U.S. at 846, under the Due Process Clause. The district court properly granted summary judgment for all the defendants on this claim.
 
 III. Fourth Amendment Claims
 
 78
 The Tenenbaums assert on behalf of Sarah[13] that both her removal and her subjection to the medical examination also violated her right to be free from unlawful searches and seizures under the Fourth Amendment, because the CWA caseworkers did not have a warrant or its equivalent authorizing Sarah's removal and emergency circumstances did not exist at the time Sarah was removed. The district court's holding with respect to these claims mirrored its procedural due-process determinations: First, the caseworkers had probable cause to believe that Sarah was in imminent danger and so her emergency removal on January 9, 1990 did not violate the Fourth Amendment. Second, once Sarah was in the CWA's custody, the caseworkers could no longer have had immediate fears for her safety and there was therefore no emergency and no justification for her search, the judicially unauthorized investigative medical examination. As to both these claims, however, the court also determined that the individual defendants were shielded because "the application of the Fourth Amendment to child abuse investigations was insufficiently established at the time of defendants' investigation to overcome their defense of qualified immunity." Tenenbaum I, 862 F. Supp. at 978. The district court therefore granted summary judgment to all the defendants on the Fourth Amendment removal claim and to the individual defendants on the medical examination portion of that claim. The court found the City had conceded that the examination was conducted pursuant to City policy, Tenenbaum III at 2-3, and that it was therefore legally responsible for the individual defendants' actions with respect thereto. Tenenbaum I, 862 F. Supp. at 978.
 
 
 79
 On appeal, the Tenenbaums assert on Sarah's behalf that contrary to the district court's holding, Sarah's removal, like her examination, was not justified by emergency circumstances and was therefore a violation of her Fourth Amendment rights. They also assert that the individual defendants are not entitled to qualified immunity. The City contends that the district court properly decided the removal aspect of the Tenenbaums' Fourth Amendment claim but that the medical examination portion also should have been dismissed because the examination was medically indicated and therefore constitutional. As with our determination of the procedural due-process claim, we find the record facts insufficient to sustain the district court's holding that as a matter of law Sarah's emergency removal was proper. But we agree with the district court that the individual defendants are entitled to qualified immunity. We also agree with the district court that the physical examination performed on Sarah without parental consent or judicial authorization violated Sarah's Fourth Amendment rights but that qualified immunity shields the individual defendants from liability on that claim as well.
 
 A. Sarah's Removal
 1. Constitutional Violation
 
 80
 Sarah was taken by a government official from her school to a hospital where she was required to remain for several hours before being examined and returned to her parents. We agree with the district court that this constituted a "seizure" under the Fourth Amendment. Cf. Graham, 490 U.S. at 395 n.10 ("A 'seizure', triggering the Fourth Amendment's protections occurs ... when government actors have, 'by means of physical force or show of authority... in some way restrained the liberty of a citizen.'"); Gardiner, 50 F.3d at 155 (an individual is seized if, under the circumstances presented, "a reasonable person would have believed he was not free to leave.") (internal quotation marks and citations omitted).
 
 
 81
 The Fourth Amendment protects "the people" from "unreasonablesearches and seizures," also providing that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized." (emphasis added).[14] In the context of a seizure of a child by the State during an abuse investigation, as the district court recognized, see Tenenbaum I, 862 F. Supp. at 974 n.7, a court order is the equivalent of a warrant. But the caseworkers here neither sought nor obtained such an order. So whether the equivalent of a warrant was properly obtained and, indeed, whether or in what sense probable cause would be required to be demonstrated in order to obtain one are not issues on this appeal.
 
 
 82
 The term "probable cause" has also been imported from the warrant clause of the Fourth Amendment and applied to its "unreasonable searches and seizures" clause. The term "probable cause" is thus not only the explicit Fourth Amendment requirement for obtaining a warrant, but also descriptive of what seizures are "reasonable" when, as here, no warrant has been obtained. See generally, Akhil Reed Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757 (1994).
 
 
 83
 This issue arises most commonly where there is a warrantless arrest.
 
 
 84
 In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.
 
 
 85
 Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted); cf. T.L.O., 469 U.S. at 340 ("probable cause" that there has been a violation of the law is ordinarily required even for searches that can be permissibly carried out without a warrant). Probable cause is a flexible term. There is no "rigid demand that specific 'tests' be satisfied." Illinois v. Gates, 462 U.S. 213, 231 (1983). "In dealing with probable cause,... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id. (internal quotation marks and citation omitted). The district court found that probable cause in this sense was required for the removal of Sarah from her school, and that it existed sufficiently to justify the defendants' actions. Tenenbaum I, 862 F. Supp. at 977.
 
 
 86
 There is a threshold issue, as the district court recognized. Does the ordinary probable-cause standard applicable to, among others, law enforcement officials making warrantless arrests also apply to caseworkers seizing children without prior court authorization? Although all agencies of government are governed by the unreasonable searches and seizures provision of the Fourth Amendment, there are some agencies outside the realm of criminal law enforcement where government officials have "special needs beyond the normal need for law enforcement [that] make the warrant and probable-cause requirement impracticable." O'Connor v. Ortega, 480 U.S. 709, 720 (1987) (plurality opinion) (internal quotation marks and citation omitted); see also id. at 732 (Scalia, J., concurring). If forcing a non law-enforcement government officer to follow ordinary law-enforcement requirements under the Fourth Amendment would impose intolerable burdens on the officer or the courts, would prevent the officer from taking necessary action, or tend to render such action ineffective, the government officer may be relieved of those requirements and subjected to less stringent reasonableness requirements instead. See O'Connor, 480 U.S. at 720; see also, e.g., T.L.O., 469 U.S. at 340-43 (school administrator's search of a student's purse was not subject to the warrant and probable-cause requirements).
 
 
 87
 Case law in other circuits indicates that emergency removal of a child by caseworkers is not such a "special needs" situation. See, e.g., Good v. Dauphin County Soc. Servs. for Children and Youth, 891 F.2d 1087, 1092-94 (3d Cir. 1989) (applying ordinary probable-cause standard to inspection of child's nude body by caseworker and police officer); Donald v. Polk County, 836 F.2d 376, 384 (7th Cir. 1988) (applying probable-cause standard to caseworkers' removal of child from parents' custody). But see Darryl H. v. Coler, 801 F.2d 893, 901-02 (7th Cir. 1986) (neither warrant nor probable cause necessary for visual inspection of child's body for signs of abuse so long as relatively stringent state regulations were followed). As the district court noted, there is at least a hint in this Circuit, too, that probable cause is required of caseworkers seizing children without judicial authorization. See Tenenbaum I, 862 F. Supp. at 974 n.6 (citing van Emrik, 911 F.2d at 867 (Fourth Amendment concerns implicated because no "probable cause" for an arrest and no risk that child's condition would change during time required to obtain a court order); and Doe v. Connecticut Dep't of Children and Youth Servs., 712 F. Supp. 277, 284 (D. Conn. 1989) ("The emergency removal of John Doe required 'probable cause' to believe that he was in immediate physical danger from his surroundings and that removal was necessary to insure his safety."), aff'd, 911 F.2d 868 (2d Cir. 1990)).
 
 
 88
 But we refrain from deciding categorically, as did the district court, that the removal of a child of whom abuse is suspected is not a "special needs" situation. There may be circumstances in which the law of warrant and probable cause established in the criminal setting does not work effectively in the child removal or child examination context.[15] This is not such a case.
 
 
 89
 First, if CWA caseworkers have "special needs," we do not think that freedom from ever having to obtain a predeprivation court order is among them. Caseworkers can effectively protect children without being excused from "whenever practicable, obtain[ing] advance judicial approval of searches and seizures." Terry v. Ohio, 392 U.S. 1, 20 (1968) (emphasis added). As we observed in discussing procedural due process, judicial authorization makes a fundamental contribution to the proper resolution of the tension among the interests of the child, the parents, and the State. At the same time, it cannot be said that the requirement of obtaining the equivalent of a warrant where practicable imposes intolerable burdens on the government officer or the courts, would prevent such an officer from taking necessary action, or tend to render such action ineffective.
 
 
 90
 Second, in determining whether the CWA overstepped constitutional bounds in the case before us it does not matter whether we call the standard applicable to Sarah's seizure "probable cause," using ordinary search and seizure analysis, or refer directly to the "unreasonable . . . seizure" language of the Fourth Amendment, as we must in "special needs" circumstances. If "probable cause" was required, and the information possessed by Williams or James would have warranted a person of reasonable caution in the belief that Sarah was subject to the danger of abuse if not removed from school before court authorization could reasonably have been obtained, then they had probable cause to remove her without first obtaining a court order. See Weyant, 101 F.3d at 852. If a more general "special needs" "reasonableness" test applies, we nonetheless see no basis upon which to depart from the probable cause standard here. If the information possessed by Williams or James would have warranted a person of reasonable caution in the belief that Sarah was subject to the danger of abuse if not removed from school before court authorization could reasonably have been obtained, her removal was reasonable also.
 
 
 91
 Finally and in any event, it is core Fourth Amendment doctrine that a seizure without consent or a warrant is a "reasonable" seizure if it is justified by "exigent circumstances." See, e.g., United States v. Karo, 468 U.S. 705, 718 (1984); Mincey v. Arizona, 437 U.S. 385, 392-93 (1978); United States v. Medina, 944 F.2d 60, 68 (2d Cir. 1991), cert. denied, 503 U.S. 949 (1992); Good, 891 F.2d at 1093-94 (discussing "exigent circumstances" principles applied to officer's alleged strip search of child while seeking evidence of abuse). The justification for this exception to the warrant requirement as it pertains to law enforcement officials is "[t]he need to protect or preserve life or avoid serious injury." Mincey, 437 U.S. at 392 (citation omitted). Applied to child-abuse investigations, the exception similarly permits removal of a child where the state officers making the search or seizure "have reason to believe that life or limb is in immediate jeopardy." Good, 891 F.2d at 1094. We hold that where information possessed by a state officer would warrant a person of reasonable caution in the belief that a child is subject to the danger of abuse if not removed from school before court authorization can reasonably be obtained, the "exigent circumstances" doctrine too permits removal of the child without a warrant equivalent and without parental consent. See, e.g., Hurlman, 927 F.2d at 80.
 
 
 92
 Whatever Fourth Amendment analysis is employed, then, it results in a test for present purposes similar to the procedural due-process standard. If information possessed by Williams or James warranted a person of reasonable caution in the belief that Sarah was subject to the danger of abuse if not removed from school before court authorization reasonably could be obtained, Sarah's removal complied with Fourth Amendment requirements despite the absence of a warrant equivalent because probable cause, reasonable cause, and exigent circumstances sufficient to justify it existed. A jury could reasonably conclude that the case here was otherwise. We reverse the district court's grant of summary judgment against Sarah on her Fourth Amendment removal claim.
 
 2. Qualified Immunity
 
 93
 Qualified immunity protects the individual defendants from liability under the Fourth Amendment for Sarah's removal. The application of Fourth Amendment standards in the child-abuse context was not clear at the time of defendants' acts in 1990. Our analysis here is similar to our analysis of the individual defendants' immunity from the procedural due-process claims. See section I.A.2, supra. There was no "clearly established" law under the Fourth Amendment from which the individual defendants could have concluded that they did not have "probable cause" to remove Sarah from P.S. 230 on an emergency basis. In this analysis, as in the parallel due-process assessment, it is particularly difficult to conclude that the individual defendants' behavior was wrongful under "clearly established" Fourth Amendment principles in light of the district court's carefully considered decision that it did not violate the Fourth Amendment at all, even though we ultimately disagree with that conclusion. We affirm the district court as to the individual defendants' qualified immunity.
 
 
 94
 We emphasize again the importance of the availability of qualified immunity where child welfare workers are seeking to protect children from abuse. If caseworkers "'of reasonable competence could disagree' on the legality of [a] defendant's actions" their behavior is protected. Lennon, 66 F.3d at 420 (quoting Malley, 475 U.S. at 341).
 
 
 95
 3. Liability of the City.
 
 
 96
 For the reasons set forth in section I.A.3., above, in connection with liability for due-process violations, the City must be liable for Sarah's removal as a violation of her Fourth Amendment rights if the removal constituted such a violation and was effected in conformity with a "policy" or "custom" of the City. As we have indicated, the City apparently conceded the latter. See Tenenbaum III, at 2-3. If it has not, the Tenenbaums on Sarah's behalf will be required to establish both aspects of her Fourth Amendment removal case at trial.
 
 B. The Medical Examination
 1. Constitutional Violation
 
 97
 The district court found that Sarah's physical examination violated her Fourth Amendment right to be free from warrantless searches. Tenenbaum I, 862 F. Supp. at 978. The City was held liable for the actions of the individual defendants because it conceded that the examination was pursuant to City policy. See Tenenbaum III, at 2-3. We agree. For the reasons discussed in the procedural due-process portion of this opinion, section I.B.1., supra, we conclude that the medical examination was "undertaken at the initiative of a state official [and] serve[d] primarily an investigative function; [and] in such circumstances, Fourth Amendment and bodily integrity interests of the child are implicated." van Emrik, 911 F.2d at 867; see also Good, 891 F.2d at 1092-93; Darryl H., 801 F.2d at 907; Schwimmer, 988 F. Supp. at 644.
 
 
 98
 Further, as discussed in connection with the Fourth Amendment implications of Sarah's removal from school, we find that the Fourth Amendment's reasonable or probable cause and exigent circumstances doctrines apply to searches and seizures made in the course of child abuse investigations. Accordingly, in the absence of a warrant equivalent, in order for the examination to have been constitutional, reasonable or probable cause or exigent circumstances justifying an emergency examination must have existed at the time the examination was performed. As the district court found, they did not. Sarah could not have been in danger from her father while she was being held by the CWA. There was ample time to obtain a court order. The district court's conclusion that there was an insufficient justification for performing the examination on an emergency basis is not clearly erroneous and we therefore affirm its judgment as to this claim.
 
 2. Qualified Immunity
 
 99
 Again, the individual defendants were rightly held by the district court to be immune. The only case that can be said to have "clearly established" the impropriety of Sarah's examination, albeit on due process not Fourth Amendment grounds, was van Emrick. It was not decided until months after the events in this case transpired. Whatever van Emrik "clearly established" therefore could not have guided the behavior of the individual defendants here and they are entitled to qualified immunity, as the district court held.
 
 IV. Other Grounds for Appeal
 A. State-law Claims
 
 100
 New York law provides absolute immunity for state and local employees when they perform discretionary, as opposed to ministerial, functions. See, e.g., Tango v. Tulevech, 61 N.Y.2d 34, 40 (1983). This protection extends to the state itself as well as its subdivisions. See Arteaga v. State, 72 N.Y.2d 212, 216 (1988). The district court dismissed the Tenenbaums' various state-law claims -- all based on the CWA's removal and physical examination of Sarah -- on the ground that James' and Williams' actions were discretionary and that absolute immunity was appropriate. Tenenbaum I, 862 F. Supp. at 981. We agree and affirm on this portion of the cross-appeal.
 
 B. Damages
 
 101
 The Tenenbaums assert that the district court's award of $15,000 to Sarah and $1.00 each to Mr. and Mrs. Tenenbaum is inadequate compensation for the constitutional violations they suffered. The damage award was peculiarly within the discretion of the trial judge. See Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1012 (2d Cir. 1995). His ability to judge the credibility of the witnesses and to assess based on their testimony the extent of their largely psychological injury cannot effectively be reviewed on appeal. See United States v. Davis, 967 F.2d 84, 86 (2d Cir.) ("trial court is in a unique position to evaluate witnesses' credibility."), cert. denied, 506 U.S. 928, 113 S.Ct. 356,121 L.Ed.2d 270 (1992). We find nothing in the record to persuade us that the district court's findings in this regard were clearly erroneous. Of course the court may make an additional award should the Tenenbaums prevail on the claims that we remand for trial.
 
 V. Claims Against the Board of Education
 
 102
 We make explicit what we think is implicit in the foregoing discussion. Public schools have a relationship with their students that is markedly different from the relationship between most governmental agencies, including the CWA, and the children with whom they deal. Constitutional claims based on searches or seizures by public school officials relating to public school students therefore call for an analysis under the Fourth and Fourteenth Amendments that is different from that set forth in this opinion. See, e.g., Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646 (1995) (routine drug testing of public school student athletes does not violate the Fourth Amendment); T.L.O., 469 U.S. 325 (1985) (Fourth Amendment "probable cause" requirement inapplicable to warrantless search by public school assistant vice principal of student's purse). Inasmuch as the plaintiffs have not pursued claims against the Board of Education or public school officials, we have no occasion to discuss this issue in further detail or to apply that analysis.
 
 Conclusion
 
 103
 In sum, we find that, with respect to Sarah's removal from school by the CWA, the district court erred in concluding as a matter of law that the Tenenbaums' and Sarah's procedural due-process rights and Sarah's Fourth Amendment rights were not infringed as a matter of law, and remand those claims to the district court for further proceedings. We conclude, however, that (1)the district court was correct in deciding that the defendants did not violate the Tenenbaums' or Sarah's substantive due-process rights as a matter of law; (2)with respect to Sarah's physical examination, the district court was correct in deciding that the Tenenbaums' and Sarah's procedural due-process rights and Sarah's Fourth Amendment rights were infringed; and (3)with respect to all the assertions of constitutional violations, the district court was correct in deciding that the individual defendants are entitled to qualified immunity. We also affirm the district court's assessment of damages with respect to Sarah's physical examination and its dismissal of the Tenenbaums' state-law claims.
 
 
 
 Notes:
 
 
 [1]
 Section 417 states, in pertinent part, that specified public officials "shall take all appropriate measures to protect a child's life and health including, when appropriate, taking or keeping a child in protective custody without the consent of a parent or guardian if such person has reasonable cause to believe that the circumstances or condition of the child are such that continuing in his or her place of residence . . . presents an imminent danger to the child's life or health." N.Y. Soc. Serv. Law 417(1)(a) (McKinney 1999).
 
 
 [2]
 Section 1024 is substantially similar to 417 but adds that, in order to effect an emergency removal without a court order, there must not be enough time to apply for such court order. See N.Y. Fam. Ct. Act 1024(a)(ii) (McKinney 1999).
 
 
 [3]
 Section 413 lists the persons and officials who are required to report cases of suspected child abuse or maltreatment to the State, and includes teachers in public schools. That section also permits such persons who are members of the staff "of a medical or other public or private institution, school, facility or agency," to report the suspected abuse to the person in charge of such institution who then becomes responsible for reporting the suspected abuse to the State. See N.Y. Soc. Serv. L. 413(1). Section 415 sets forth the proper procedures for such reporting.
 
 
 [4]
 The defendants assert in their reply brief on appeal that Williams was justified in treating Sarah's situation as an emergency by the end of the day Monday because he thought the Tenenbaums had been told to telephone him that day and "the Tenenbaums took the allegation of sex abuse so lightly that they did not even call him." But, as Williams was of course aware, the Tenenbaums knew nothing about the sexual abuse allegation because he had given the order that they not be told about it.
 
 
 [5]
 Section 1021 of the New York Family Court Act provides that an authorized official may temporarily remove a child who is abused or neglected under the Act with the written consent of the child's parents or other person legally responsible for his or her care. See N.Y. Fam. Ct. Act 1021.
 
 
 [6]
 Section 1022 provides that under certain circumstances the family court may enter an order directing the temporary removal of a child from the place where he or she is residing. See N.Y. Fam. Ct. Act 1022.
 
 
 [7]
 Counsel for the defendants on this appeal conceded at oral argument that "perhaps, in this case, a court order if sought could have been obtained on that day."
 
 
 [8]
 Section 2.2 of the Regulation of the Chancellor relating to Reports of Suspected Child Abuse and Maltreatment then in effect read in part: "The school must permit Child Protective Services workers to take children into their custody, upon their presentation of either a court order or a written statement from the Office of Special Services for Children."
 
 
 [9]
 The defendants do not argue that the school's routine consent to Sarah's removal and, by implication, her later physical examination were effective as a substitute for parental consent. We do not think that they were. Although public school children have been said to be "committed to the temporary custody of the State as schoolmaster," Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995), the Supreme Court has rejected the notion that public schools generally "act in loco parentis in their dealings with students: [that] their authority is that of the parent . . . . Such reasoning is in tension with contemporary reality and the teachings of th[e] Court." New Jersey v. T.L.O, 469 U.S. 325, 336 (1985). If it were otherwise, a public school could in effect consent to its own infringements of students' Fourth and Fourteenth Amendment rights thereby rendering these rights meaningless as against the school. The Supreme Court has held to the contrary that a public school is an agency of the State subject to constitutional scrutiny when it performs a search with respect to a student. See T.L.O., 469 U.S. at 336-37. The handing over of a child from a public school teacher to another State official, then, is not the equivalent of the consent of the parents. See Gardiner v. Incorporated Village of Endicott, 50 F.3d 151, 156 (2d Cir. 1995) ("The parties agree that in light of [a parent's] constitutionally protected liberty interest in the custody of her child, [the child] could not be removed from school by . . . police officers, absent a court order, an emergency, or parental consent.").
 The extent to which a private person or institution with temporary caretaking responsibilities for a child may effectively consent to a government official's removal of the child and her subsequent physical examination is not in issue in this case. We intimate no views on the question.
 
 
 [10]
 We thus do not hold, expressly or implicitly, as the dissent suggests, see dissent, post, at [13] n.4, that notice to parent or guardian is constitutionally required.
 
 
 [11]
 We do not read the Tenenbaums' complaint or their appeal papers to contend that the medical examination performed on Sarah itself violated the substantive rights afforded by the Due Process Clause and we therefore do not address that issue.
 
 
 [12]
 It is plain to us if not to the dissenting judge, see dissent, post, at [18], that if the time for which a child is held is extended in order to permit resort to the courts, that extension of time will not convert the seizure from a lawful one to one that infringes the substantive due-process rights of the child or his or her parents.
 
 
 [13]
 "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Alderman v. United States, 394 U.S. 165, 174 (1969). But see J.B. v. Washington County, 127 F.3d 919, 928 (10th Cir. 1997) (there may be circumstances in which a parent has Fourth Amendment standing to challenge the seizure of his or her minor child). The district court held that the Tenenbaums did not have standing to bring a Fourth Amendment claim in their own behalf with respect to the State's treatment of Sarah. We do not read their appeal papers to challenge this conclusion.
 
 
 [14]
 The Fourth Amendment's search and seizure provisions are applicable to the defendants through the Fourteenth Amendment's Due Process Clause. See, e.g., Mapp v. Ohio, 367 U.S. 643, 655 (1961).
 
 
 [15]
 We thus need not decide, as the district court did, for example, whether caseworkers ever have "special needs" that would permit them to base a removal of a child on information from an anonymous source contrary to ordinary probable cause jurisprudence. See Tenenbaum I, 862 F. Supp. at 975-76.
 
 
 
 104
 JACOBS, Circuit Judge, concurring in part, and dissenting in part:
 
 
 105
 I concur generally in the portions of the majority opinion that affirm the dismissal of the Tenenbaums' substantive due process and state law claims. I respectfully dissent from the remainder of the opinion, however, because I see no constitutional violation, and would not reach the question of qualified immunity or the Tenenbaums' challenge to the district court's award of damages.
 
 A. Removal of Sarah
 
 106
 1. Definition of "Emergency"
 
 
 107
 We have previously held that an emergency is an exigent situation in which a child welfare worker may take custody of a child without parental consent and without a court order. Thus the majority recites: "in 'emergency circumstances,' a child may be taken into custody by a responsible State official without court authorization or parental consent." Majority Opinion at 22-23 (quoting Hurlman v. Rice, 927 F.2d 74, 80 (2d Cir. 1991)). This standard has been applied again and again. See Gottlieb v. County of Orange, 84 F.3d 511, 520 (2d Cir. 1996) ("It is established... that government officials may remove a child from his or her parents' custody before a hearing is held where there is an objectively reasonable basis for believing that a threat to the child's health or safety is imminent."); Cecere v. City of New York, 967 F.2d 826, 829 (2d Cir. 1992); Robison v. Via, 821 F.2d 913, 922 (2d Cir. 1987) ("[I]t is sufficient if the officials have been presented with evidence of serious ongoing abuse and therefore have reason to fear imminent recurrence."); Duchesne v. Sugarman, 566 F.2d 817, 825-26 (2d Cir. 1977).
 
 
 108
 The majority opinion announces a new and incompatible principle: that there is no such emergency, notwithstanding the exigency, if there is or may be time to obtain a court order. None of our cases has held that the availability of the emergency-removal exception depends on whether there is time to obtain judicial pre-authorization. Each of our prior cases requires only that an emergency exist, a fact that is determined by reference to the child's peril, not the case worker's schedule or the court's calendar. This is a sensible formulation, and one that keeps the child welfare worker focused on what matters first in these cases, the child's precarious welfare. "When a child's safety is threatened, that is justification enough for action first and hearing afterward." Lossman v. Pekarske, 707 F.2d 288, 291 (7th Cir. 1983), quoted in Robison, 821 F.2d at 921.
 
 
 109
 The error of the majority opinion is to recast a child-welfare emergency in terms of a procedural emergency, i.e., whether the danger to the child is so pressing that no court order is feasible. Thus the majority opinion requires a child welfare worker, at peril of personal liability, to make the additional determination as to whether there is time enough to secure court authorization. An already-difficult calculus is thus complicated by a new and confusing set of standards and risks. Cf. Wilkinson v. Russell, 182 F.3d 89, 105 (2d Cir. 1999) ("[C]ourts must be especially sensitive to the pressurized circumstances routinely confronting case workers, circumstances in which decisions between difficult alternatives often need to be made on the basis of limited or conflicting information." (internal quotation marks omitted)).
 
 
 110
 The circumstances of this case objectively justified invocation of the emergency exception. At the time the child welfare workers decided to effect the removal of Sarah Tenenbaum for a hospital exam, they knew: that the little girl was mute some or all of the time (a state consistent with some appalling trauma); that she had nevertheless expressed to her teacher that she was being hurt in her sexual parts by her father; that her mother worked nurse's hours; and that her father (whose hours as a Board of Education plumber were unknown) might or might not be home when she left kindergarten each day. I would therefore affirm summary judgment for the defendants on the removal claim.
 
 
 111
 2. Applying the Majority's New Rule.
 
 
 112
 Under the rule announced by the majority, however, a jury would decide if there was time for the child welfare worker to obtain a court order. Was there time in this case? How long does it take? The City concedes that it can be done in a day: was there a day? The majority's treatment of these questions demonstrates that in terms of legal risk the only safe course now open for a social worker or the City will be to obtain a court order in every case. To illustrate: Supervisor Williams made the decision to remove Sarah for examination on Tuesday morning, January 9, and she was removed before the noon dismissal of her kindergarten class; yet the majority opinion holds that there was sufficient time to obtain a court order because the decision could have been made "as early as Monday," and a court order could have been procured in a day. See Majority Opinion at 25.
 
 
 113
 The opportunity to seek a court order, as supposed in the majority opinion, is premised on the implied criticism that the decision to remove Sarah should have been made sooner or faster. Thus the majority criticizes Williams for awaiting a call from the Tenenbaums (a call the Tenenbaums aver they were never told to make), even after the record on which he acted was otherwise complete. But Supervisor Williams did not get the report on the interviews with Sarah and the teacher until after they were conducted sometime on Monday, and made his decision on Tuesday morning.[1]
 
 
 114
 There is therefore no basis for finding a delay of any appreciable number of workday hours. Similarly, the majority opinion criticizes inaction over the weekend, and suggests that efforts could have been made to find Sarah's teacher before Monday.[2] Thus in this case, where the child welfare workers acted with dispatch, having taken action no more than a few business hours after receipt of a full report, everyone involved has been criticized (and--but for immunity in this case only--made subject to liability) both for delay and for haste. That is why the only safe decision a child-welfare worker can make (from a liability standpoint) is to get a court order regardless of risk to the child.
 
 
 115
 The error of the majority opinion is partly traceable to the City's admission that it routinely effects emergency removals and rarely seeks judicial pre-authorization. Such a policy might be called into question in a case in which no objective emergency existed. But this is not such a case, nor is it a class action; the only issue before the Court is whether the child welfare workers were justified in bypassing judicial pre-authorization in their removal of Sarah Tenenbaum, which in my view they clearly were. Whether they acted pursuant to a city policy bears on whether there would have been municipal liability if the defendants had committed a constitutional violation, see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38 (1978), not on whether there was a constitutional violation in the first place.
 
 
 116
 The majority opinion, however, treats the City's policy as circumstantial evidence from which a jury could infer a lack of emergency in this case, i.e., that the decision to remove Sarah was triggered by compliance with the City's policy rather than by the judgment of the child welfare workers.
 
 
 117
 As the majority opinion thus demonstrates, the new constitutional standard--and therefore the liability of case workers and municipalities--depends upon a highly subjective determination as to whether there is time to get a court order, a question that is more complicated than it seems. The majority opinion holds that a decision made on Tuesday morning, and acted upon a couple of business hours later, is unconstitutional because a court order could have been obtained if (as the majority thinks) the information available on Monday afternoon was enough. Such second-guessing places in jeopardy the case worker or supervisor who does the more thorough investigation, thinks a bit longer before acting, or does something Tuesday morning that could have been done on Monday afternoon. This kind of analysis draws the federal court into decisions about bureaucratic practice and technique, and into the tough choices that caseworkers must make and that we should not.
 
 
 118
 The addition of this subjective element is contrary to this Court's precedents, all of which have assessed due process challenges to emergency removals in terms that are strictly objective. See, e.g., Wilkinson, 182 F.3d at 104 ("An investigation passes constitutional muster provided simply that case workers have a reasonable basis for their findings of abuse." (internal quotation marks omitted) (emphasis added)); Gottlieb, 84 F.3d at 520 ("It is established... that government officials may remove a child from his or her parents' custody before a hearing is held where there is an objectively reasonable basis for believing that a threat to the child's health or safety is imminent." (emphasis added)); Cecere, 967 F.2d at 829 ("[T]he only issue before us is whether the assertion of custodial authority by [the defendant] was objectively reasonable." (emphasis added)); Robison, 821 F.2d at 922 ("The belief that the danger was of emergency proportions was likewise objectively reasonable." (emphasis added)); see Chayo v. Kaladjian, 844 F. Supp. 163, 169 (S.D.N.Y. 1994) ("[I]t is this Court's task to focus on the objective legal reasonableness of the defendants' actions, rather than the defendants' subjective state of mind." (internal quotation marks and citation omitted)).[3]
 
 3. The Danger of the Majority's New Rule
 
 119
 One harm of the majority opinion will be to make summary judgment largely unattainable in due process and Fourth Amendment cases brought by parents challenging emergency removals. Ordinarily, a judge would have little trouble ascertaining as a matter of law that the child welfare worker faced an emergency, objectively considered. (This case, in my view, is one of them.) But it will be all too easy for a plaintiff to point to some circumstance from which a jury could infer that the decision to intervene could have been made sufficiently in advance of the time it was made to allow the case worker to get a court order. Delay will not be hard to find: child welfare officers often must practice triage, deciding which endangered child must wait while another one, in seemingly greater peril, takes precedence. Decisions on emergencies are delayed, reviewed and reconsidered, or stuck in a superior's in-box. And even a child welfare worker overburdened with real emergencies is a human being who might go to lunch, take a personal day, go home on time, or spend weekends at home.
 
 
 120
 If the delays that inhere in any bureaucracy are sufficient to raise a material question as to whether the exigency foreclosed the seeking of a court order, then nearly every such case will have to be tried to a jury. And individual child welfare workers, whose qualified immunity defense in such cases has now become tenuous, could be individually liable for damages. The only safe harbor for child welfare workers in such a legal environment will be to seek and then await a court order in every instance, with the result that some children will be left too long in abusive situations.
 
 
 121
 My principal concern is that the majority's approach, so measured and reasonable in the pages of a federal appellate opinion, will work serious harm in an exceptionally sensitive area of state responsibility. "[C]onsiderable deference must be accorded the delicate judgments made by responsible state officials. Perhaps in no context is this truer than where the state is acting as parens patriae to protect children from imminent danger." Jordan v. Jackson, 15 F.3d 333, 348 (4th Cir. 1994); see also Wilkinson, 182 F.3d at 104 (discussing the "compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves" (internal quotation marks omitted)). The job of the child welfare worker requires a delicate balancing of risks. Already, there are incentives to err on the side of excessive caution rather than excessive action. See John C. Jeffries, Jr., In Praise of the Eleventh Amendment and Section 1983, 84 Va. L. Rev. 47, 74-78 (1998). The majority opinion reinforces that tendency, which will be bad news for abused children.
 
 
 122
 Although the majority opinion finds that the individual defendants in this case are qualifiedly immune from damages, the issuance of the holding in this appeal means (inter alia) that qualified immunity in similar situations may no longer be available in this Circuit. Every time a child welfare worker has reason to suspect child abuse, she will have to consider (i) whether there is reason to believe the child is in imminent danger (which until now has been all that was required) and (ii) whether there is time to get to court and obtain a court order (the majority's new requirement) as well as (iii) whether a court or jury will second-guess that decision on the basis that more efficient decision-making would have afforded sufficient time to obtain the court order. In terms of litigation, individual liability and damages, an error on the side of removal is risky, while an error on the other side is safe. See DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 201-02, 109 S.Ct. 998, 1006-07 (1989) (no 1983 liability for state defendants' failure to remove child from abusive situation). The incentive will be to allow some number of children--their constitutional rights preserved--to return home to a predatory adult.[4]
 
 B. Physical Examination of Sarah
 
 123
 The majority is on stronger precedential ground in sections I.B. and III.B., which address the physical examination of Sarah. It concludes that the examination was investigative in the police sense, rather than medically indicated, and therefore inappropriate without parental consent or judicial preauthorization.
 
 
 124
 The principal authority in this Circuit on the question of medical examinations during the course of child abuse investigations is van Emrik v. Chemung County Department of Social Services, 911 F.2d 863 (2d Cir. 1990). In that case, two parents took their small child to the hospital, where a leg fracture was diagnosed. See id. at 864. Suspicious that the baby-sitter had caused the injury, the parents agreed with hospital personnel that the case should be reported to the state's child abuse "hot line." See id. at 864-65.
 
 
 125
 When the child was about to be discharged, the assigned case worker asked the attending physician to perform "long-bone x-rays." Id. at 865. The doctor demurred because of the radiation risk, and so advised the case worker. See id. The case worker prevailed on the doctor, however, insisting that she needed "to know if there were other fractures that had gone undetected and had healed." Id.
 
 
 126
 In a fact-specific opinion, the van Emrik court emphasized that the x-rays in that case "were not medically indicated" and that the doctor had initially opposed them. Id. at 867. "The x-rays were not sought to facilitate diagnosis or treatment.... but to provide investigative assistance to the caseworker." Id. The court concluded that parents' liberty interest in the "care, custody, and management of their child" was especially "significant" when an examination "serve[s] primarily an investigative function." Id. In such cases, the Court held, it is improper to perform the examination without a judicial finding of justification and reasonableness.
 
 
 127
 The district court here found that "the gynecological examination of Sarah--like the examination of the child in van Emrik--was not conducted 'to provide medical treatment to the child, but to provide investigative assistance to the caseworker.'" Tenenbaum v. Williams, 907 F.Supp. 606, 618 (E.D.N.Y. 1995) (quoting van Emrik, 911 F.2d at 867). The sole evidence on this point is the testimony of defendant Nat Williams to the effect that Sarah was examined to detect sexual abuse. The district court construed this testimony (which is set out in the margin[5]) as a concession that the examination was "purely investigatory," as van Emrik used that term. The district court thus read the word "investigatory" as a term of art suggesting (to lawyers) a police or criminal investigation. However, the district court (as well as the majority opinion) fail to appreciate that medical diagnostics is also "investigatory"--in the sense that the physician investigates whether the patient would benefit from treatment.
 
 
 128
 In van Emrick, there was no question that the examination was conducted exclusively to further the forensic investigation: the case worker was seeking evidence of healed fractures, and the procedure was medically harmful (in the doctor's view). The holding of van Emrik therefore extends no further than instances in which medical justification is lacking. The case should not be read to bar physical examinations that serve a medical purpose, even if a law enforcement purpose is served as well.
 
 
 129
 No doubt, the physical examination of Sarah Tenenbaum had its forensic uses. But it was also investigatory in the additional sense that signs of sexual abuse would have served important diagnostic purposes: a five-year-old girl who has been sexually abused by an adult male (a) may need immediate medical care; and (b) may need to be kept out of an environment in which she would be exposed to further medical and psychological injury.
 
 
 130
 These cases being necessarily quite fact-specific I believe that, notwithstanding the holding in this case, the door stands open for the City to prove in other cases, or after adoption of new guidelines, that the investigatory purpose of the Tenenbaum-style examination is chiefly diagnostic, and designed to ascertain whether the child is in need of medical treatment and protection from further injury.
 
 
 131
 The majority notes that "if Sarah had ever been in imminent danger," she was no longer in danger while in the custody of the child welfare workers. They therefore had time to seek judicial authorization for the examination. See Majority Opinion at 37-38, 54. Of course, in another portion of the opinion (in which I concur), we affirm dismissal of the plaintiffs' substantive due process claim on the ground that the "temporary separation" of Sarah and her parents "was not severe enough" to constitute a violation of substantive due process. See Majority Opinion at 42. These two rulings will create a dilemma for the child welfare worker who has removed a child and sees a need for a medical examination. She might await judicial authorization, which may require overnight detention, with concomitant delays sufficient to support a substantive due process claim. Or she might go ahead with the examination, in order to return the child home as soon as possible, and run the risk of procedural due process and Fourth Amendment liability.
 
 
 132
 * * *
 
 
 133
 The influence of this opinion is potentially far-reaching. The Court creates a new procedural requirement that burdens, punishes, and thereby marginally inhibits decisive action to protect children from people in their households.
 
 
 
 Notes:
 
 
 [1]
 The majority quotes testimony of caseworker James that Williams told her on Monday that she "would have to take [Sarah] to the hospital," and deduces from that testimony that Williams made the decision on Monday. But James' categorical testimony on this point establishes that she did not act on Monday because the decision could only be made by Williams, i.e., the decision and order to act had not happened.
 
 
 [2]
 "Although the CWA maintains an emergency children's services unit that is on call nights and weekends, no one contacted it about the Tenenbaum situation." Majority Opinion at 11.
 
 
 [3]
 Some of these cases addressed qualified immunity, rather than the underlying constitutional claim. As we have recently noted, however, the cases in this area typically collapse the two inquiries, so the qualified immunity cases are directly relevant to this discussion. See Wilkinson, 182 F.2d at 107 & n.10.
 
 
 [4]
 Another passage in the majority opinion also has this unintended effect of increasing the risks of child abuse. The majority opinion strongly implies that the defendants in this case should have complied with New York's statute governing "preliminary" removal orders. See Majority Opinion at 13-14 & n.6 (citing N.Y. Fam. Ct. Act 1022). Although such an order can be obtained ex parte, the officer seeking it must make a notice showing, i.e., either that "the parent or other person legally responsible" for the child is "absent" or that the parent refused to consent to the child's temporary removal. See N.Y. Fam. Ct. Act 1022(a); see also id. 1023; In re Adrian J., 119 Misc.2d 900, 464 N.Y.S.2d 631, 633 (Fam. Ct. 1983) (finding 1022 order "jurisdictionally defective" and therefore a "nullity" when child protection workers "failed to ask [parents] to consent to a temporary removal of the child").
 The majority opinion thus has the effect of imposing a constitutional requirement of parental notice. It is worth pointing out that while the child welfare worker is seeking the order, the child will presumably remain in the custody of the alleged abuser, who is thereby alerted to the accusation and has time to coach the child, or take other measures. I cannot agree that the Constitution requires resort to the New York statute even when a child is in objective danger of harm. Cf. Robison, 821 F.2d at 923 ("Federal constitutional standards rather than state statutes define the requirements of procedural due process.").
 
 
 [5]
 * "[M]y decision was that [Sarah] should be removed from the school and taken to Coney Island Hospital, specifically to be examined to rule out sexual abuse."
 *"Q: [Y]ou removed or had Sarah removed because you wanted to have a medical examination done to determine whether or not she had been sexually abused; is that correct?
 A: That is correct."
 *"I was doing [the exam] to determine whether or not the child had been sexually abused."